RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

'ABDUL HALIYM, also known as WAYNE FRAZIER,
*Petitioner-Appellant,*

*v.*

BETTY MITCHELL, Warden,
*Respondent-Appellee.*

No. 04-3207

>

---

Appeal from the United States District Court
for the Northern District of Ohio.
No. 98-02073—Dan A. Polster, District Judge.

Argued: October 31, 2006

Decided and Filed: July 13, 2007

Before: MERRITT, SILER, and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Jeffry F. Kelleher, Cleveland, Ohio, for Appellant. Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellee. **ON BRIEF:** Robert A. Dixon, Cleveland, Ohio, for Appellant. Daniel R. Ranke, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellee.

CLAY, J., delivered the opinion of the court, in which MERRITT, J., joined. SILER, J. (pp. 34-35), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

CLAY, Circuit Judge. Petitioner 'Abdul Haliym, formerly known as Wayne Frazier, appeals the district court's denial of his petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner raises multiple challenges to his convictions for, *inter alia*, two counts of aggravated murder and his sentence of death. For the reasons stated below, we **AFFIRM** the district court's denial of the writ with respect to Petitioner's convictions, but **REVERSE** the district court's denial of the writ with respect to Petitioner's sentence because Petitioner was denied the effective assistance of counsel during the mitigation phase of his sentencing.

1

# I. BACKGROUND

## A.    Factual Background

The Ohio Supreme Court found the following facts on direct appeal:

> On March 25, 1987, Marcellus Williams and Joann Richards were stabbed to death in their apartment located at 49th and Central in Cleveland. Derek Speights, age nineteen, was visiting his father, Williams, at the time and was also stabbed.
>
> Appellant, Wayne Frazier, was indicted on April 6, 1987 in a six-count indictment. The first count charged appellant with the aggravated murder of Joann Richards in violation of [O.] R.C. [§] 2903.01, and contained aggravated felony, gun, mass murder and felony murder specifications. Count two charged appellant with the aggravated murder of Marcellus Williams in violation of [O.] R.C. [§] 2903.01, and contained the same four specifications as in count one. Count three charged appellant with aggravated burglary in violation of [O.] R.C. [§] 2911.11, and contained aggravated felony and gun specifications; count four charged appellant with the attempted murder of Speights in violation of [O.] R.C. [§] 2903.02 and [O.] R.C. [§] 2923.02, and contained aggravated felony and gun specifications; count five charged appellant with the aggravated robbery of Williams in violation of [O.] R.C. [§] 2911.01, and contained aggravated felony and gun specifications; and count six charged appellant with the aggravated robbery of Richards in violation of [O.] R.C. [§] 2911.01, and contained aggravated felony and gun specifications.
>
> Appellant entered a plea of not guilty to all six counts in the indictment on April 17, 1987. Appellant waived his right to a jury trial and chose to be tried by a three-judge panel. On August 26, 1987, a motion for leave to file a plea of not guilty by reason of insanity was granted.
>
> The trial commenced on August 31, 1987. Derek Speights testified that on March 25, 1987, at approximately 10:00 p.m. as he was leaving his father's apartment to go to the store, he was approached by three men who were in an orange Chevette. He identified Wayne Frazier as the driver, Derrick Evans as the passenger in the front seat, and Michael Frazier as the individual in the back seat. Speights testified that appellant inquired as to whether Speights' father, Williams, was in the apartment. Speights advised appellant that Williams was in, and appellant told Speights to inform his father that appellant would be back.
>
> Approximately fifteen to twenty minutes after Speights returned from the store, appellant, his brother Michael Frazier, and Evans arrived at Williams' apartment. The three entered and were seated. Richards was present with her baby. For approximately five minutes they all engaged in conversation. Suddenly, Evans jumped up and held a gun to Williams' head and cocked the gun. Speights further testified that Evans told everyone not to move or he would kill them and asked Williams for money. At that point Speights was knocked down; however, he was able to observe appellant stabbing Richards. Also, Speights saw Evans stabbing Williams. At the same time, Michael was stabbing Speights.
>
> Also present in the apartment was seven-year-old Albert Richards. He was in the bedroom and came out in response to the noise and observed the stabbings. Albert identified the appellant in a line-up as someone he knew as "Twin." Albert testified that "Twin" killed his mother, and that "Day-Day," a nickname for Evans, stabbed Albert's father.
>
> Speights testified to all the events that had occurred in the apartment, and that he managed to leave the apartment and summon help. He also identified the appellant as the person who stabbed Joann Richards.

The coroner, Dr. John A. Daniels, testified that he conducted an autopsy on both Williams and Joann Richards. Joann Richards was stabbed thirty-two times. The wounds were from one-half inch to one and one-half inches in depth. The cause of death was multiple stab wounds causing perforation of the heart, main pulmonary artery, and liver, ultimately resulting in exsanguination. The coroner further testified that Williams had been stabbed nine times. The depth of these wounds ranged from three-fourths of an inch to six inches. The cause of death was multiple stab wounds to the chest with perforation of the thoracic aorta and internal and external bleeding.

After speaking with Albert and other people on the scene, the police determined the identity of Wayne Frazier, and subsequently apprehended him. On March 26, 1987, the police interviewed appellant, at which time he made a statement. Appellant admitted that he was at the victims' apartment earlier in the evening on the 25th. As a result of this statement and a follow-up interview of appellant on March 27, the police learned of several different locations where property from the crime scene was located. Various items belonging to Williams and Richards were recovered. In addition, clothing of the appellant and his two accomplices which they had attempted to burn was recovered. A buck knife was found which the appellant said looked like his except for rust spots. Another knife was also recovered by the police, which was identified by Albert as the one used to kill his mother.

*State v. Frazier*, 574 N.E.2d 483, 485-96 (Ohio 1991).

## B.        Procedural History

On April 6, 1987, Petitioner was indicted for two counts of aggravated murder, each carrying a prior felony specification, a firearm specification, and two capital specifications, namely a mass murder specification pursuant to O.R.C. § 2929.04(A)(5) and a felony murder specification pursuant to O.R.C. § 2929.04(A)(7). He was also charged with one count of aggravated burglary, one count of attempted murder, and two counts of aggravated robbery, each containing a prior felony specification. On August 6, 1987, Petitioner waived his right to a jury; he was tried before a three-judge panel at a trial beginning on August 31, 1987. The panel found him guilty on all charges and specifications on September 3, 1987. The sentencing hearing began on September 22, 1987, and the panel sentenced Petitioner to death on the same day. A brief written opinion to this effect was filed on September 23, 1987.

Petitioner appealed his convictions and sentence, raising fourteen assignments of error. As pertinent to the issues on this appeal, Petitioner raised the issue of the competency of the child witness who testified against him at trial, the adequacy of the same witness' oath, and the constitutionality of Petitioner's counsel during the penalty phase of Petitioner's trial. On January 11, 1990, the Ohio Court of Appeals reversed the firearm specification but otherwise upheld the convictions and the sentence of death.

Petitioner, through counsel, appealed as a matter of right to the Ohio Supreme Court, raising fourteen assignments of error. In addition, Petitioner submitted a pro se supplemental brief, alleging ten assignments of error. On July 31, 1991, the Ohio Supreme Court affirmed the decision of the Ohio Court of Appeals in all respects. *Frazier*, 574 N.E.2d at 486. Petitioner filed a petition for writ of certiorari with the United States Supreme Court, which was denied. *Frazier v. Ohio*, 503 U.S. 941 (1992).

Petitioner next sought relief through post-conviction proceedings under O.R.C. § 2953.21, raising twenty-one assignments of error.[1]   Included in these claims of error were claims that Petitioner was deprived of the effective assistance of counsel during trial and sentencing,[2] that his conviction was void or voidable because he did not knowingly, voluntarily, and intelligently waive his right to a jury, that his conviction was void or voidable because of an in-court identification procured by an unnecessarily suggestive line-up, and that his conviction was based on the testimony of a child witness who was incompetent to testify.

On March 25, 1997, the Ohio Court of Common Pleas issued findings of fact and conclusions of law with respect to Petitioner's O.R.C. § 2953.21 petition, denying the petition in all respects. The Court of Common Pleas concluded that several of Petitioner's claims were barred by the doctrine of res judicata because they could have been raised on direct appeal. As relevant here, the Court of Common Pleas dismissed on res judicata grounds Petitioner's claims that (1) he received ineffective assistance of counsel at trial; (2) he was convicted by an unnecessarily suggestively identification procedure; and (3) he was convicted based on the testimony of a child who was incompetent to testify. The Court of Common Pleas denied Petitioner's claim with respect to the involuntary jury waiver based on the holding of *State v. Pless*, 658 N.E.2d 766, 766 (Ohio 1996), holding that insofar as the trial court lacked jurisdiction because of a failure to file a time-stamped waiver form, the remedy for this violation was limited to direct appeal.

Petitioner appealed the Court of Common Pleas' denial of his claims raised in the § 2953.21 petition to the Ohio Court of Appeals. On March 12, 1998, the Ohio Court of Appeals affirmed the Court of Common Pleas in all respects. *State v. Haliym*, No. 72411, 1998 WL 108139 (Ohio Ct. App. Mar. 12, 1998) (unpublished). Petitioner appealed to the Ohio Supreme Court, raising nine alleged errors. The Ohio Supreme Court declined to exercise jurisdiction on June 17, 1998. *State v. Haliym*, 695 N.E.2d 264 (Ohio 1998).

On September 10, 1998, Petitioner filed the instant petition for habeas corpus in the Northern District of Ohio. On March 17, 2000, the district court granted Petitioner's motion to stay the proceedings so that Petitioner could reopen his case in state court to exhaust his state court remedies. Petitioner sought to reopen his case in the Ohio Court of Appeals, pursuant to Ohio Rule of Appellate Procedure 26(B), also known as a *Murnahan* proceeding.[3]

Petitioner filed his *Murnahan* application on August 22, 2000, which was untimely. As construed by the court of appeals, the application raised two issues:

---

[1]O.R.C. § 2953.21 provides in relevant part:

> Any person who has been convicted of a criminal offense . . . and who claims that there was such a denial or infringement of the person's right as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States . . . may file a petition . . . asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief.

[2]This was the first time that Petitioner raised his specific claim that counsel was ineffective for failing to investigate and present certain mitigating evidence.

[3]So named for *State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992), the case that led to Rule 26(B). In relevant part, Ohio R. App. P. 26(B) reads:

> (1) A defendant in a criminal case may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel. An application for reopening shall be filed in the court of appeals where the appeal was decided within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time.

(1) the three-judge panel did not have jurisdiction to try [Petitioner] because the jury waiver statute, [O.] R.C. [§] 2945.05, was not fulfilled and because there is insufficient evidence that he knowingly, intelligently and voluntarily waived his right to a jury trial; and (2) his trial counsel was ineffective because he committed a plethora of errors, including failure to interview witnesses, failure to examine Albert Richards' prior statements, failure to challenge Albert Richards' identification of Mr. Haliym, failure to challenge Mr. Haliym's custodial statements, failure to obtain expert witnesses, and failure to put the entire trial, including jury waiver, pre-trial conferences, competency hearing and arraignment, on the record.

*State v. Frazier*, No. 54771, 2001 WL 1002232, at *1 (Ohio Ct. App. Aug. 27, 2001) (unpublished).

The Ohio Court of Appeals found that Petitioner did not have good cause to file an untimely *Murnahan* application, and proceeded to deny Petitioner's claims on the merits. Petitioner filed a timely notice of appeal to the Supreme Court of Ohio. The Supreme Court of Ohio affirmed the decision of the Ohio Court of Appeals on August 21, 2002. The syllabus reads in relevant part:[4]

> {¶ 5} Haliym raises three issues on this appeal. First, Haliym claims that he had good cause for the late filing of his application for reconsideration under [Ohio R. App. P.] 26(B). However, our disposition of Haliym's second and third propositions, which argue the merits of his case, negates any need to decide that issue.
>
> {¶ 6} Haliym's second and third propositions relate to the merits of issues that he claims his former appellate lawyers should have raised. In proposition II, Haliym argues that his appellate counsel were ineffective by failing to challenge a jurisdictional defect resulting from a violation of the jury waiver statute, [O.] R.C. [§] 2945.05. In proposition III, Haliym asserts that his appellate counsel were ineffective for failing to raise numerous other assignments of error on direct appeal before the court of appeals. The two-pronged analysis found in *Strickland v. Washington*, [466 U.S. 668, 687 (1984)], is the appropriate standard to assess whether Haliym has raised a "genuine issue" as to the ineffectiveness of appellate counsel in his request to reopen under [Rule] 26(B)(5). *State v. Sheppard*, [744 N.E.2d 770 (2001)]; *State v. Spivey*, [701 N.E.2d 696 (1998) ]; *State v. Reed*, [660 N.E.2d 456 (1996)].
>
> {¶ 7} "To show ineffective assistance, [defendant] must prove that his counsel were deficient for failing to raise the issues he now presents and that there was a reasonable probability of success had he presented those claims on appeal." *Sheppard* 744 N.E.2d 770, *citing State v. Bradley*, [538 N.E.2d 373 (1989)], paragraph three of the syllabus. Moreover, to justify reopening his appeal, Haliym "bears the burden of establishing that there was a 'genuine issue' as to whether he has a 'colorable claim' of ineffective assistance of counsel on appeal." *Spivey*, 701 N.E.2d 696.
>
> {¶ 8} We have reviewed Haliym's assertions of deficient performance by appellate counsel and find that Haliym has failed to raise "a genuine issue as to whether [he] was deprived of the effective assistance of counsel on appeal" as required by [Rule] 26(B)(5). Accordingly, the judgment of the court of appeals is affirmed.

---

[4]Under Ohio law, only the syllabus of Supreme Court cases is controlling. *See LSI Industs. Inc. v. Hubbell Lighting, Inc*., 232 F.3d 1369, 1372 n.3 (6th Cir. 2000).

*State v. Frazier*, 772 N.E.2d 1182, 1183-84 (Ohio 2002) (per curiam) (ninth and eleventh alterations in original).

After the conclusion of the state court proceedings, Petitioner litigated this case in the district court pursuant to his petition for the writ of habeas corpus, alleging 20 grounds for relief. The district court denied the petition, but granted a certificate of appealability on four claims in whole or in part. Specifically, the district court granted a certificate of appealability as to Petitioner's claims that (1) an invalid jury waiver denied him his right to a jury trial; (2) the trial court lacked jurisdiction to try the case because of an invalid jury waiver; (3) trial counsel was ineffective for failing to discover and present certain mitigating evidence; and (4) appellate counsel rendered ineffective assistance on direct review. On February 17, 2004, Petitioner filed a timely notice of appeal. On February 23, 2005, this Court granted a certificate of appealability with respect to several additional claims, namely, (5) claims pertaining to the competency and the admissibility of the testimony of Albert Richards; (6) the propriety of Albert's line-up identification; (7) the propriety of the alleged nondisclosure of prior inconsistent statements by Albert; and (8) that the trial court impaired appellate review by failing to preserve the complete trial record.[5]

## II.  DISCUSSION

### A.      Standard of Review

In reviewing the district court's decision, we review legal conclusions *de novo* and findings of fact for clear error. *Williams v. Bagley*, 380 F.3d 932, 941 (6th Cir. 2004) (citing *Wickline v. Mitchell*, 319 F.3d 813, 817 (6th Cir. 2003)). However, to the extent that a district court bases its findings on a transcript, making no credibility determinations or other original findings of fact, its factual findings are reviewed *de novo*. *Id.* (citing *Miller v. Francis*, 269 F.3d 609, 613 (6th Cir. 2001)).

Because this case involves a petition for habeas corpus filed after the effective date of the Antiterrorism and Effect Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1219 (1996) (codified at 28 U.S.C. § 2254), AEDPA governs this Court's review. *See Williams*, 380 F.3d at 943 (petitions filed after AEDPA's effective date are governed by AEDPA regardless of when the underlying crime was committed). Under 28 U.S.C. § 2254(d), a state court adjudication on the merits cannot be overturned unless it "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A state court decision is "contrary to" established federal law for purposes of § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 941-42 (alternations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). Under § 2254(d)(2), a state court's application of federal law is "unreasonable" "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 942 (alteration in original) (quoting *Williams*, 529 U.S. at 413). In determining whether a state court's decision was unreasonable, it is not enough that the determination was incorrect, or that this Court would have reached a different result if faced with the issue in the first instance. *See Williams*, 529 U.S. at 410 ("[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."). With respect to state court findings of fact, under AEDPA such findings are presumed to be correct. 28 U.S.C. § 2254(e)(1).

---

[5]Despite the grant of a certificate of appealability, Petitioner has declined to pursue issues (7) and (8).

The petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. *Id.*

Additionally, a federal court will not hear a petitioner's claim if that claim is procedurally defaulted. This prohibition is derived from the principle that federal courts will not review a state court decision that rests on adequate and independent state grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). A petitioner's failure to comply with a state procedural rule can constitute an independent and adequate state ground for not reviewing a decision based on the state procedural rule. *See id.* at 730. In determining whether a failure to comply with a state procedural rule precludes federal habeas review, this Court must undertake a four step analysis of the state court's decision in its last explained judgment. *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000). First, the Court must determine whether the petitioner failed to comply with an applicable state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). Second, the Court must determine whether the state court actually enforces that state procedural rule. *Id.* Third, the Court must consider whether the state procedural rule constituted an independent and adequate state ground. *Id.* If all of the above are met, then the burden is on the petitioner to demonstrate that he had "cause" not to follow the state procedural rule and that he suffered prejudice. *Id.*; *see Wainwright v. Sykes*, 433 U.S. 72, 90-91 (1977). "Cause" requires a showing that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Importantly, ineffective assistance of counsel can constitute "cause," so long as that ineffective assistance of counsel claim is not itself procedurally defaulted. *Id.* at 489. "Prejudice" requires a showing that the errors at trial "worked to [the petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 168 (1982).

## B.       Ineffective Assistance of Appellate Counsel

Petitioner's first assignment of error is that his appellate counsel on direct appeal was constitutionally ineffective by failing to challenge the Ohio trial court's failure to file a time-stamped jury waiver form.

### 1.       Preservation

Under Ohio Rule of Appellate Procedure 26(B)(1), claims raising the ineffective assistance of appellate counsel can be raised for the first time in the *Murnahan* proceeding to reopen the case following direct review. Petitioner raised this issue for the first time in his *Murnahan* application before the Ohio Court of Appeals, but that application was not timely filed. The Ohio Court of Appeals refused to consider it for that reason.

However, in determining whether a claim is procedurally defaulted, this Court must look to the last *explained* state court judgment. *Combs*, 205 F.3d at 275 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991)). If the state court considered Petitioner's alleged error on the merits notwithstanding the fact that it was not timely filed, then the state court's determination does not rest on a procedural ground that bars federal review. The parties disagree about whether the Ohio Supreme Court's decision in *State v. Frazier*, 772 N.E.2d 1182, 1183-84 (Ohio 2002) (per curiam), constitutes a judgment on the merits for purpose of excusing Petitioner's untimely *Murnahan* application.

We hold that the decision of the Ohio Supreme Court did constitute a decision on the merits such that review by a federal court is appropriate. The telltale sign that the Ohio Supreme Court based its decision on the merits of Petitioner's claim is the language of the opinion itself. The Ohio Supreme Court stated:

{¶ 5} Haliym raises three issues on this appeal. First, Haliym claims that he had good cause for the late filing of his application for reconsideration under [Ohio R. App. P.] 26(B). However, *our disposition of Haliym's second and third propositions, which argue the merits of his case, negates any need to decide that issue*.

*Id.* at 1183 (emphasis added). The Ohio Supreme Court went on to identify the controlling substantive standard of the claim, *id.*, and determined that there was no "genuine issue." *Id.* at 1184. This conclusion followed the Ohio Supreme Court's explicit statement that it had "reviewed Haliym's assertions of deficient performance by appellate counsel." *Id.* The fact that the court did not review these assertions on the pages of a published opinion is irrelevant. *See Frazier v. Huffman*, 343 F.3d 780, 799-800 (6th Cir. 2003) (concluding that a parsimonious state court discussion constituted a decision on the merits); *Ylst*, 501 U.S. at 806-07 (White, J. concurring) (explicit statement from a state court that it is ruling on the merits is a ruling on the merits for habeas purposes even if the ruling is summary in nature); *cf. id.* at 805 (Majority Op.) (cases cited by the state court in an unexplained disposition were irrelevant because they did not address the merits of the petitioner's claim).

Despite the clear language of the Ohio Supreme Court's opinion in *Frazier* to the contrary, Respondent argues that *Frazier* did not constitute a decision on the merits. Respondent asserts that we should distinguish between a judgment on the merits and a more cursory "no genuine issue" analysis. According to Respondent, there are two conditions that must be satisfied before the Ohio Supreme Court reaches the merits of an untimely-filed *Murnahan* application. First, a petitioner must demonstrate "good cause" for not timely filing his *Murnahan* application. *See* Ohio. R. App. P. 26(B)(1) ("An application for reopening shall be filed in the court of appeals where the appeal was decided within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time."). Second, a petitioner must show a "colorable claim" that appellate counsel was constitutionally ineffective. *See* Rule 26(B)(5) ("An application for reopening shall be granted if there is a genuine issue as to whether the applicant was deprived of the effective assistance of counsel on appeal."). In Respondent's view, an Ohio court only reaches a determination on the merits after these two prerequisites are met.

We agree with Respondent that a showing of "good cause" and a showing of a "genuine issue" are prerequisites that must be met before a *Murnahan* application is reopened and a petitioner becomes entitled to more extensive appellate procedure. *Murnahan* proceedings provide a method for the Ohio courts to expeditiously resolve ineffective assistance of appellate counsel claims that lack merit on their face, while simultaneously allowing Ohio courts to devote substantial resources to claims that evince a higher probability of success. A *Murnahan* application is a two stage procedure. *Lopez v. Wilson*, 426 F.3d 339, 340 (6th Cir. 2005) (en banc), *cert. denied*, 126 S. Ct. 1880 (2006); *see also* Ohio R. App. P. 26(B), Staff Note, (July 1, 1993 amendment) (describing two stage procedure in which the first stage involves a threshold showing and the second stage involves more extensive appellate procedures). At the first stage, the court considers whether to grant the application to reopen proceedings. In order to provide the court with the necessary facts to make this determination, Rule 26(B) requires that an application contain, *inter alia*, "[a] showing of good cause for untimely filing if the application is filed more than ninety days after journalization of the appellate judgment," Rule 26(B)(2)(b), and "[o]ne or more assignments of error or arguments in support of assignments of error that previously were not considered on the merits in the case by any appellate court or that were considered on an incomplete record because of appellate counsel's deficient representation." Rule 26(B)(2)(c). "[I]f there is a genuine issue as to whether the applicant was deprived of the effective assistance of counsel on appeal" then "[a]n application for reopening shall be granted." Rule 26(B)(5). The Rule 26(B) application to reopen is a streamlined procedure. Applications are strictly limited in length to under ten pages, and oral argument is not granted except at the request of the court. Rule 26(B)(4). Moreover, a defendant is not entitled to counsel under

Ohio law or the federal constitution at the first stage of the *Murnahan* proceeding. *Lopez*, 426 F.3d at 341.

In the event that an application to reopen is granted, the defendant is afforded the opportunity to fully develop his claim of ineffective assistance of appellate counsel. An application that is granted proceeds as an initial appeal, and the defendant is permitted to submit briefing and present oral argument. *See* Rule 26(B)(7). A defendant who is indigent and unrepresented is entitled to have counsel appointed on his behalf. Rule 26(B)(6)(a). And, if necessary, the court will order an evidentiary hearing. Rule 26(B)(8).

We disagree with Respondent's argument, however, because we conclude that an Ohio court's finding that there is "no genuine issue," which denies the *Murnahan* application at stage one of the two stage procedure, is a determination on the merits for the purpose of excusing procedural default. This conclusion follows from an examination of the purposes that underpin a federal court's refusal to hear procedurally defaulted claims. Principles of comity and federalism dictate that a federal court will not overturn a state court judgment that rests on independent and adequate state grounds. *Coleman*, 501 U.S. at 730. When the last state court to issue a decision rests its judgment on federal grounds, or state grounds that are interwoven with federal grounds (and thus not independent), a federal habeas court may consider claims of federal rights, because its determination of those federal claims, if contrary to that of the state court, upsets the foundation of the state court's decision. *Id.* at 735; *see also Harris v. Reed*, 489 U.S. 255, 260-62 (1989).[6] The relevant question is whether the last reasoned state court decision "fairly appears" to rest on federal law. *See Ylst*, 501 U.S. at 803.

The Ohio Supreme Court's decision in *Frazier* does fairly appear to rest on federal law. *See* 772 N.E.2d at 1183-84. The Ohio Supreme Court identified the controlling federal law, citing the relevant federal precedent. *Id.* at 1183 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). The Ohio Supreme Court also explicitly stated that it was adjudicating the claim on the merits–and expressly stated that it was *not* adjudicating the claim on the procedural ground that Petitioner could not demonstrate "good cause." *Id.* Thus, the Ohio Supreme Court's decision was clearly based on its view of the merits of Petitioner's claim under federal law.

Respondent argues that, in the context of the denying a *Murnahan* application, "good cause" and a "colorable claim" are separate requirements. Therefore, Respondent reasons, holding that Petitioner did not present a "colorable claim" does not imply that the Ohio Supreme Court considered Petitioner to have "good cause" for excusing his default. Although we agree with Respondent, this argument fails to comprehend the justification for our refusal to hear federal claims that are procedurally defaulted. In order for Petitioner to ultimately prevail on his claim of ineffective assistance of counsel, Petitioner must prevail on every element of his claim. This includes the federal law element of Petitioner's claim, *i.e.*, that he was deprived of the effective assistance of counsel under the Sixth and Fourteenth Amendments, and the state law element of his claim, *i.e.*, that his claim was timely or that he had good cause to excuse its untimeliness. The Ohio Court of Appeals found that Petitioner failed to satisfy both the federal and state law elements. *Frazier*, 2001 WL 1002232, at *1-*3. The Ohio Supreme Court, the last court to render a decision on Petitioner's claim, rested its judgment *solely* on the federal law element, disclaiming any reliance

---

[6]Likewise, the dismissal of a claim pursuant to a state procedural rule does not bar federal habeas review if that state rule is not "consistently or regularly applied," because in such a case the state ground is not independent and adequate. *See Johnson v. Mississippi*, 486 U.S. 578, 588-89 (1988); *see also Buell v. Mitchell*, 274 F.3d 337, 350-51 (6th Cir. 2001).

on the state law ground.  Because the judgment did not rest on any state law ground, let alone an independent and adequate state law ground, federal review of Petitioner's claim is proper.[7]

### 2.          Merits

Petitioner argues that his appellate counsel was constitutionally ineffective in failing to contest the trial court's jurisdiction.  Petitioner claims that the trial court violated O.R.C. § 2945.05 by failing to file Petitioner's signed jury waiver form, and this violation deprived the trial court of jurisdiction.  According to Petitioner, had appellate counsel challenged the jury waiver, the court of appeals would have vacated the judgment of the trial court.

Petitioner had a constitutional right to counsel on his first appeal.  *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  In considering whether the assistance of counsel was constitutionally ineffective, we apply the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, in order for Petitioner to show that counsel's performance was so deficient as to deprive him of his Sixth and Fourteenth Amendment rights, he must show:  (1) that counsel's performance was objectively deficient; and (2) prejudice, which means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687, 694.

Turning to the basis of Petitioner's claim, Ohio Revised Code § 2945.05 provides:

> In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury.  Such waiver by a defendant, shall be in writing, signed by the defendant, and *filed in said cause and made a part of the record thereof.*

§ 2945.05 (emphasis added).

It is undisputed that, although Petitioner executed a signed jury waiver in this case, that waiver was not filed and made a part of the record.  Nor do the parties dispute that, under current Ohio law, a court would lack jurisdiction to try a defendant in the absence of strict compliance with O.R.C. § 2945.05.  *See State v. Pless*, 658 N.E.2d 766, 766 (Ohio 1996) (syllabus) ("Absent strict compliance with the requirements of [O.] R.C. [§] 2945.05, a trial court lacks jurisdiction to try the defendant without a jury.").  The dispute instead concerns the state of the law in 1989, when Petitioner's direct appeal was filed.  Petitioner argues that the requirement of strict compliance was mandated by the Ohio Supreme Court's decision in *State v. Tate*, 391 N.E.2d 738, 738 (Ohio 1979) (syllabus) ("[I]t must appear of record that such defendant waived this right in writing in the manner provided by [O.] R.C. [§] 2945.05, in order for the trial court to have jurisdiction to try the defendant without a jury.").  Respondent argues that before *Pless*, Ohio appellate courts applied a less rigorous "substantial compliance" standard when evaluating a trial court's jurisdiction under O.R.C. § 2945.05.  *See, e.g.*, *State v. Griffin*, 469 N.E.2d 1329, 1332 (Ohio Ct. App. 1979) ("The waiver of jury must be in writing and must be made knowingly, intelligently and voluntarily . . . but there is no requirement that the court must . . . cause the underlying agreement to be made a part of the record.").

---

[7]We note that certain language in our opinions is difficult to reconcile with Respondent's position.  For example, in *Lott v. Coyle*, 261 F.3d 594, 611-12 (6th Cir. 2001), the Ohio court had denied Lott's *Murnahan* application without reopening the case.  The petitioner argued that the court had reached the merits of his jury waiver claim; the respondent argued that the *Murnahan* opinion addressed only the merits of the ineffective assistance of appellate counsel claim.  *Id.* at 612.  Were Respondent correct, the *Murnahan* claim in *Lott* would not have reached the merits of any decision.

In addressing the merits of this issue, we do not write on a clean slate. The outcome of our inquiry is governed by this Court's decision in *Lott v. Coyle*, 261 F.3d 594, 609-10 (6th Cir. 2001). *Lott* involved a habeas petition filed by a petitioner who was facing the death penalty, where an Ohio trial court had failed to file the jury waiver in accordance with O.R.C. § 2945.05. The *Lott* petitioner argued that his failure to raise his jury waiver claim before the trial court was excused by the ineffective assistance of his appellate counsel. Because the petitioner in *Lott* had not raised this issue in his *Murnahan* proceeding, the *Lott* court correctly found that his claim was foreclosed by *Murray*, 477 U.S. at 488-89. The Court nevertheless proceeded to discuss the merits of petitioner's claim on the assumption that his claim was not barred:

> Lott cannot demonstrate cause for his procedural default, because he cannot establish the requisite cause for his ineffective-assistance-of-appellate-counsel claim. At the time that Lott filed his *Murnahan* motion on June 30, 1993, it was unclear whether, under Ohio law, a defendant's strict compliance with § 2945.05 was required to execute a valid waiver, or whether substantial compliance was sufficient. *Compare State v. Harris*, 596 N.E.2d 563, 568 (Ohio Ct. App. 1991) (holding that strict compliance with § 2945.05 is required to execute a valid waiver) *with State v. Morris*, 455 N.E.2d 1352, 1355 (Ohio Ct. App. 1982) (suggesting that substantial compliance is satisfactory, provided that § 2945.05 is satisfied "by a writing signed by the defendant himself and filed with the court") *with Marysville v. Foreman*, 603 N.E.2d 1155, 1158 (Ohio Ct. App. 1992) (noting that "[w]here there is a written waiver filed with the court after arraignment and opportunity to consult with counsel, there has been a substantial compliance with the applicable rules and statutes and there is no error"). Thus, we cannot conclude that Lott's counsel should have reasonably anticipated in 1993 the Ohio Supreme Court's 1996 decision in *Pless*, which finally resolved the issue and required strict compliance with each requirement of § 2945.05 for execution of a valid jury waiver.

*Lott*, 261 F.3d at 609 (alternations in original). Moreover, this language in *Lott* is not mere dicta. Refusing to reach the question of whether a failure to file a jury waiver in accordance with § 2945.05 was a jurisdictional matter that could not be defaulted, the *Lott* court relied upon this analysis to deny the petitioner's jury waiver claim, holding that "Lott's entry of a signed and written waiver made in open court, although not filed and made part of the record, would meet the less restrictive, pre-*Pless* substantial compliance standard." *Id.* at 610.

The decision in Lott's direct appeal was handed down on March 16, 1989; Petitioner's direct appeal was decided on January 20, 1990. The law with respect to this issue was the same for both Lott and Petitioner. Petitioner's appeal is thus controlled by *Lott*.[8]

Petitioner attempts to distinguish our holding in *Lott* by arguing that Lott (1) conceded that the requirements of § 2945.05 were satisfied at various points throughout the litigation; and (2) attached a filed jury waiver form to his petition for post-conviction relief. *See id.* at 606 n.5. These distinctions do not remove this case from the purview of *Lott*. Regarding the fact that Lott conceded jurisdiction at various points throughout the appeal, this fact is of no moment because the *Lott* court did not rely upon this fact in its analysis. As a matter of law this fact is a nullity.

---

[8]We acknowledge that there is a technical distinction between the ineffective assistance of appellate counsel *claim* presented by Petitioner, and ineffective assistance of counsel as a *cause* to excuse the procedural default of another claim, as argued by the petitioner in *Lott*. To the extent that they are distinct, however, *claims* that appellate counsel's performance constituted ineffective assistance of counsel are subject to *more* demanding scrutiny than that applied when ineffective assistance of counsel must serve only as a *cause* excusing the procedural default of another claim. *See Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir. 1999) (holding that "*Murray* applies to those circumstances in which an attorney's error does not rise to that level" of ineffective assistance of counsel requiring reversal under *Strickland*).

Regarding the attachment of the signed jury waiver form that Lott filed, this fact does not affect the outcome because in both *Lott* and the instant case the issue was whether a technical violation of § 2945.05 sufficed in 1989 or 1990 to deprive a trial court of jurisdiction. The fact that, in this case, the jury waiver form was not filed, as opposed to *Lott* where the form was not "made a part of the record thereof," does not alter the substantial compliance analysis in *Lott*, 261 F.3d at 609-10. Because the law with respect to the necessity of strict compliance with § 2945.05 was uncertain, Petitioner's appellate counsel was not constitutionally ineffective for failing to raise the issue on direct appeal. *See id.* at 610. Petitioner therefore cannot demonstrate that he was deprived of the effective assistance of appellate counsel. *Strickland*, 466 U.S. at 687.

## C.        Improper Filing of the Jury Waiver

Petitioner's second alleged error is the substantive error underlying his ineffective assistance of appellate counsel claim, namely, that the trial court was without jurisdiction to try him because the jury waiver form was not filed in accordance with O.R.C. § 2945.05. Unlike Petitioner's ineffective assistance of appellate counsel claim, this claim is procedurally defaulted, and cannot serve as the basis for granting relief to Petitioner.

To reiterate, this Court employs a four part inquiry in determining whether a claim is procedurally defaulted. First, we must determine whether the petitioner failed to comply with an applicable state procedural rule. *Maupin*, 785 F.2d at 138. Second, we must determine whether the state courts actually enforce the state procedural rule. *Id.* Third, we must consider whether the state procedural rule constituted an independent and adequate state ground. *Id.* If all of the above are met, then the burden is on the petitioner to demonstrate that he had "cause" not to follow the rule and that he suffered prejudiced. *Id.*; *see also Wainwright*, 433 U.S. at 90-91.

Applying this standard to the facts of this case, the Ohio courts have an applicable procedural rule barring defendants from challenging the trial court's compliance with § 2945.05, except on direct review. In *Pless*, the Ohio Supreme Court held that "[t]he failure to comply with [O.] R.C. [§] 2945.05 may be remedied only in a direct appeal from a criminal conviction." 658 N.E.2d at 766 (syllabus). Furthermore, Petitioner failed to comply with Ohio's procedural rule. Petitioner did not raise his improperly filed jury waiver claim on direct appeal, instead raising the claim for the first time before the Ohio Court of Common Pleas in his post-conviction proceedings pursuant to O.R.C. § 2953.21. The Ohio Court of Common Pleas denied Petitioner's claim in accordance with *Pless*. The Ohio Court of Appeals affirmed on this basis. *Haliym*, 1998 WL 108139, at *6. Moreover, we can find nothing to suggest that the Ohio courts do not enforce the rule of *Pless*, or that the rule of *Pless* does not constitute an independent and adequate state ground for denying Petitioner's claim. Finally, it follows from our denial of Petitioner's ineffective assistance of appellate counsel claim that Petitioner cannot demonstrate cause and prejudice to excuse his default.[9]

## D.        Knowing, Voluntary, and Intelligent Jury Waiver

Petitioner's next claim of error is that his election to waive his right to a jury and instead be tried by a three-judge court was not knowing, voluntary, and intelligent.

---

[9]Because this claim potentially implicates subject matter jurisdiction, which can be raised at any time, we share the hesitancy of the *Lott* court in concluding that Petitioner's claim is procedurally defaulted. Unlike the petitioner in *Lott*, however, Petitioner here does not argue that the jurisdictional nature of this claim renders a procedural default analysis inapposite. Whether O.R.C. § 2945.05 implicates subject matter jurisdiction is an issue that this Court need not decide. We consider it sufficient to hold that, to the extent that Petitioner's claim raises an issue of subject matter jurisdiction, this issue is foreclosed on the merits by this Court's prior determination in *Lott*, 261 F.3d at 610.

### 1.    Preservation

Petitioner's claim is, as the district court found, procedurally defaulted.  Petitioner did not raise his claim on direct appeal; he first raised the claim in post-conviction proceedings.  In doing so, he raised together in one assignment of error the issue concerning the voluntariness of the jury waiver and the issue of whether the jury waiver was properly filed (discussed above).  The Ohio Court of Appeals rejected his claim; however, they construed the claim as only pertaining to whether the jury waiver form was properly filed, without addressing Petitioner's contention that his waiver was not knowing, voluntary, and intelligent.

Although the holding of *Pless*–that the failure to challenge the application of O.R.C. § 2945.05 cannot be remedied on direct appeal–is inapplicable to Petitioner's challenge to the voluntariness of the jury waiver, it is nevertheless clear that the Ohio Court of Appeals did not reach the merits of Petitioner's voluntary and intelligent jury waiver claim.  Thus, the court did not remove the procedural bar to our consideration of the merits of Petitioner's claim.

Applying the test from *Maupin*, Petitioner's claim is procedurally defaulted.  Petitioner failed to comply with Ohio's rule requiring that he raise this claim on direct appeal.  *See Maupin*, 785 F.2d at 138.  It is clear that Ohio courts enforce this rule, and that the rule constitutes an independent and adequate state ground.  *See id.*  Thus, the burden is on Petitioner to show cause and prejudice.  *See Wainwright*, 433 U.S. at 90-91.  Petitioner, in his *Murnahan* application, did raise the issue of whether counsel's failure to challenge his jury waiver constituted ineffective assistance of counsel.[10] Petitioner is therefore not barred by *Murray*, 477 U.S. at 488-89, from demonstrating that his appellate counsel's failure to raise the issue constituted cause for the procedural default.  To answer the question of whether Petitioner can make this showing, we turn to the merits of Petitioner's claim, and conclude that he cannot.

### 2.    Merits

The right to a jury is fundamental.  *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).  "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."  *Brady v. United States*, 397 U.S. 742, 748 (1970).  "Whether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case."  *Adams v. United States ex rel. McCann*, 317 U.S. 269, 278 (1942).  A defendant may waive his right to a jury trial if four elements are established:  (1) the waiver must be in writing; (2) the government must consent to the waiver; (3) the trial court must consent to the waiver; and (4) the defendant's waiver must be voluntary, knowing, and intelligent.  *United States v. Martin*, 704 F.2d 267, 271 (6th Cir. 1983).  A petitioner bears the burden of proving that his waiver of a jury trial was not knowing, voluntary, or intelligent.  *Sowell v. Bradshaw*, 372 F.3d 821, 832 (6th Cir. 2004).  Although this Circuit has not stated the precise formula for what constitutes the constitutionally minimum understanding that a defendant must possess in order to validly waive his right to a jury,

---

[10]We disagree with the district court's conclusion that Petitioner did not raise this claim in his *Murnahan* proceeding.  Petitioner raised this claim before the court of appeals.  *See Frazier*, 2001 WL 1002232, at *1 (construing Petitioner's claim as that the "three-judge panel did not have jurisdiction to try him because the jury waiver statute, [O.] R.C. [§] 2945.05, was not fulfilled and *because there is insufficient evidence that he knowingly, intelligently and voluntarily waived his right to a jury trial*" (emphasis added)).  Although the Ohio Supreme Court did not specifically mention this claim, nothing in its analysis demonstrates that it severed this claim from the rest of Petitioner's claims, which the court "reviewed . . . and [found] that Haliym has failed to raise 'a genuine issue as to whether [he] was deprived of the effective assistance of counsel on appeal' as required by [Ohio R. App. P.] 26(B)(5)."  *Frazier*, 772 N.E.2d at 1184.  As with Petitioner's challenge to the improperly-filed jury waiver, we conclude that this constitutes a judgment on the merits for the purpose of excusing Petitioner's default of his ineffective assistance of appellate counsel claim.

a waiver satisfies the fourth element of the test if "the defendant 'understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge.'" *Id.* at 836 (quoting *United States v. Sammons*, 918 F.2d 592, 597 (6th Cir. 1990)); *see also Williams v. DeRobertis*, 715 F.2d 1174, 1180 (7th Cir. 1983). Although an on-the-record colloquy with the court is advisable, it is not constitutionally required. *Sowell*, 372 F.3d at 832 n.5.

In this case, it is undisputed that there was a written waiver, signed by Petitioner, and approved by the government and the trial court. The issue thus turns on whether Petitioner's waiver was knowing, voluntary, and intelligent. Although there is no record of a colloquy between Petitioner and the trial court, there is persuasive evidence that the court did inquire as to whether Petitioner voluntarily signed the jury waiver. Petitioner stated at his deposition that he was asked about the waiver form, and he confirmed that it was his signature on it. He could not recall if he was asked any other questions by the trial court. One of Petitioner's trial attorneys, Timothy Koral, testified at his deposition that the trial judge read the waiver in open court. The record also contains evidence that Petitioner's right to a jury was explained to him to some extent. Petitioner's second trial attorney, Ralph DeFranco, who was in the jail cell with Petitioner when he signed the jury waiver form, testified that he explained to Petitioner that only three individuals were needed to convict him as opposed to a twelve member jury. Furthermore, on cross-examination at an evidentiary hearing, Petitioner testified that he understood that he had a right to a jury, and that he was, in effect, waiving that right. Given these facts, Petitioner has not shown that he did not understand that he was giving up his right to be tried before members of the community to instead be tried by a three-judge court. *See id.* at 836.

As the district court noted, this case is somewhat analogous to *Spytma v. Howes*, 313 F.3d 363 (6th Cir. 2003). There, the defendant was a fifteen-year-old child who was tried as an adult for first-degree murder. *Id.* at 365. On habeas review, the defendant argued that his waiver of his right to a jury trial was not knowing, voluntary and intelligent. *Id.* at 370. He testified at an evidentiary hearing that he did not understand the right to a jury trial, that he simply did what his attorney told him to do, and there was no colloquy on the record (even though there was a court log showing the waiver approved and signed in open court). *Id.* at 371. The court denied his petition for habeas, concluding that given the passage of time and the bare record, the petitioner's own testimony did not rebut the state court factual findings by clear and convincing evidence. *Id.* Petitioner tries to distinguish *Spytma*, arguing that in *Spytma* there were state court findings of fact that required clear and convincing evidence to rebut; here there are no explicit state court findings on this issue. While this is relevant, it cannot overcome the fundamental problem that in *Spytma*, the defendant testified that he did not understand the right he was relinquishing. *Id.* at 371. Petitioner, by contrast, testified that he did understand.

Petitioner also argues that his waiver was invalid because he was never informed that waiving his right to a jury would reduce the sentencing phase of his trial from a two-step process whereby a judge and jury must determine that death is appropriate to a one-step process where the panel could impose the sentence of death. This Court has rejected this challenge on indistinguishable facts, albeit in an unpublished opinion. *Gammalo v. Berlin*, No. 04-4136, 138 F. App'x 731, 731 (6th Cir. 2005) (unpublished) (per curiam), *cert. denied*, 126 S. Ct. 1032 (2006); *see also Henderson v. Walls*, 296 F.3d 541, 556 (7th Cir. 2002), *vacated on other grounds*, 537 U.S. 1230 (2003) (dismissing argument and noting that the Supreme Court has declined to grant certiorari on this issue (citing *Jells v. Ohio*, 498 U.S. 1111 (1991))). With no precedent in support of his

contention, Petitioner cannot demonstrate that his appellate counsel was ineffective under *Strickland*, 466 U.S. at 694.[11]

Because Petitioner cannot demonstrate cause, we need not reach the issue of whether Petitioner can demonstrate prejudice. We conclude that the district court properly refused to grant the petition on this ground.

## E.     Confrontation Clause

Petitioner argues that the trial court violated Petitioner's Sixth and Fourteenth Amendment right to confront the witnesses against him by admitting the testimony of Albert, age seven, who was allegedly incompetent to testify and did not understand the oath. We agree with the parties and the district court that this claim has been properly preserved for review.

Petitioner's claim rests on two separate but related theories. First, Petitioner claims that Albert was incompetent, which effectively deprived Petitioner of any opportunity to cross-examine Albert, because Albert could not respond to questions in any meaningful sense. Second, Petitioner argues that, because Albert did not understand the oath, Petitioner was deprived of an opportunity to cross-examine Albert under oath, which, according to Petitioner, is a requirement implicit in the right to confront witnesses. Since this Court does not review state court evidentiary rulings, our review is limited to whether Petitioner can demonstrate a violation of his federal constitutional rights. *Bell v. Arn*, 536 F.2d 123, 125 (6th Cir. 1976). Nevertheless, the Ohio Supreme Court's findings of fact made in connection with the state evidentiary issues are binding for purposes of the constitutional inquiry absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Mitzel v. Tate*, 267 F.3d 524, 537 (6th Cir. 2001).

At trial, when Albert was administered the oath, the following exchange occurred:

| | |
|---|---|
| Judge Nugent: | Raise your right hand up, will you? Do you swear to tell the truth, the whole truth, and nothing but the truth, as you shall answer to God? |
| | [Witness does not respond] |
| | Say "I do." |
| The Witness: | I do. |
| . . . | |
| Judge Nugent: | How old are you, Albert? |
| The Witness: | Seven |

[Questions by the prosecutor shortly thereafter]

Q.     What grade are you in?
A.     First going into the second.
Q.     . . . Where do you go to school?
A.     I forget.
Q.     You forget? Well, you just moved in with your grandmother not so long ago, right? Okay.

---

[11]We express no opinion on the proper resolution of this claim if faced with the issue as a matter of first instance. We merely hold that, as no controlling precedent establishes this right, Petitioner's appellate counsel was not constitutionally ineffective for their failure to challenge the jury waiver on appeal.

> Albert, you heard the Judge say – have you raise your right hand. You remember that?
> A.    Yes.
> Q.    And he had you swear to God. You know when he you told you that?
> A.    Yes.
> Q.    Do you know what that means?
> A.    No.
> Q.    Do you know the difference between a good boy and a bad boy?
> A.    Yes.
> Q.    What happens to you if you're bad, and you tell lies?
> A.    Going to get a whooping, get paddled.
> Q.    You get a whipping and get paddled?
>       Are you supposed to tell the truth all the time?
> A.    Yes.
> Q.    Do you and will you tell the truth?
> A.    Yes.

J.A. at 476-78.

Before the Ohio Supreme Court, Petitioner argued that Albert's testimony should have been excluded under Ohio Evidence Rule 601 because "Albert did not understand the nature of an oath, the necessity to tell the truth, and failed to demonstrate the intellectual capacity necessary to relate the events of the night in question."[12] *Frazier*, 574 N.E.2d at 486. The Ohio Supreme Court rejected this argument and held that Albert was competent to testify:

> Albert appeared to have the ability to receive and recollect accurate impressions and relate the events of the night in question. . . . Albert consistently testified that if he did not tell the truth he would receive a "whooping." Albert exhibited an understanding of truth and falsity and appeared to appreciate his responsibility to be truthful.
>                                     . . .
> Lastly, appellant argues that Albert was incompetent to testify since he did not understand the meaning of an oath. . . . The trial court administered the oath to Albert and was satisfied that he knew that he was required to tell the truth and that if he did not tell the truth he would be punished. . . . Accordingly we find that the witness was competent to testify; thus the trial court did not abuse its discretion in so finding.

*Id.* at 487.

The Confrontation Clause of the Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The Confrontation Clause "is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford v. Washington*, 541 U.S. 36, 62 (2004). "[T]he right guaranteed by the Confrontation Clause . . . (1) insures that the witness will give his statements under oath–thus impressing him with

---

[12]Ohio Evidence Rule 601 reads in relevant part: "Every person is competent to be a witness except: (A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; [and] (2) forces the witness to submit to cross-examination, the greatest legal engine ever invented for the discovery of truth. . . ." *Craig*, 497 U.S. at 845-46 (quoting *California v. Green*, 399 U.S. 149, 158 (1970)) (alternation in original) (internal quotation marks and citation omitted); *see also id.* at 862 (Scalia, J. joined by Brennan, J.; Marshall, J.; and Stevens, J. dissenting) ("The Confrontation Clause guarantees not only what it explicitly provides for . . . but also implied and collateral rights such as cross-examination, oath, and observation of demeanor."). The Confrontation Clause, however, "guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *United States v. Owens*, 484 U.S. 554, 559 (1988) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987)).

In *Walters v. McCormick*, the Ninth Circuit considered a similar issue to the one we presently confront. 122 F.3d 1172 (9th Cir. 1997). Walters, the defendant, was convicted of sexual assault and sexual intercourse without consent. *Id.* at 1174. The alleged victim was K.C., who was four years old at the time of trial. *Id.* K.C. was allowed to testify by video tape. *Id.* Her testimony was "riddled with inconsistencies," and "varied, depending primarily on who was questioning her." *Id.* at 1175. For example, K.C. testified both that Walters had molested her and that her mother had invented the story; she also testified that God smiles when you tell the truth, but sometimes he wants you to lie. *Id.* Walters filed a petition for the writ of habeas corpus, claiming that his constitutional rights to confrontation and due process were violated by the Montana trial court's admission of K.C.'s testimony. *Id.* This alleged violation existed because any confrontation of a witness as "vacillatory and manipulatable" as K.C. was not meaningful and could not constitute "confrontation" under the Sixth Amendment. *Id.* Moreover, K.C.'s testimony was allegedly infirm because she did not demonstrate an understanding of her duty to tell the truth or of the oath that she took. *Id.*

The *Walters* majority rejected both of these claims. It rejected Walters' claim that K.C.'s lack of capacity violated the Confrontation Clause by merely stating that "Walters cites no direct precedent for this novel proposition. We reject it." *Id.* Rejecting Walters' claim that K.C.'s testimony violated the Confrontation Clause because K.C. lacked the capacity to understand the duty to testify truthfully, the majority reasoned that it was the "'literal right to 'confront' the witness at the time of trial' that forms the core of the values furthered by the Confrontation Clause.'" *Id.* (quoting *Green*, 399 U.S. at 157). The court further stated that a witness' incapacity to understand the duty to testify truthfully was not reason itself to exclude the testimony, at least where there was "reason to believe that the incriminating testimony will be truthful." *Id.* at 1176. The court observed that "no federal court has held that the Constitution places limits on allowing even the youngest child to testify at trial." *Id.* (citing *Stincer*, 482 U.S. at 742 n.12). It concluded that "[b]ecause Walters was allowed to make the jury fully aware of the child's arguable incapacity [through cross-examination], the Confrontation Clause was satisfied." *Id.*

In dissent, Judge Noonan argued that the fact that the witness could not understand what truth-telling was meant that she could not be "a witness within the meaning of the Sixth Amendment." *Id.* at 1182. "If the witness is incapable of understanding the duty to testify truthfully, the witness is incompetent." *Id.* Judge Noonan reasoned that the Confrontation Clause had the right of cross-examination at its core, and was enacted to grant defendants the power to defend themselves.[13] *Id.* "You cannot cross-examine an idiot, a victim of Alzheimer's a baby–they cannot understand what they are supposed to do. No more could you cross-examine this child who

---

[13]*Walters* drew upon the history of the Salem Witchcraft Trials as the historical impetus for this right; the Supreme Court makes the same point, that the Confrontation Clause exists for the accused to protect himself from false accusations through cross-examination, drawing instead on the narrative of Sir Walter Raleigh. *See Crawford*, 541 U.S. at 44-45.

did not understand what it was to tell the truth.  Walters was not denied the right of effective cross-examination.  He was denied the right to cross-examine."  *Id.* at 1182.

We consider Judge Noonan's approach to be more consistent with Supreme Court precedent and the purpose of the Confrontation Clause.  In *Craig*, although the majority and the dissent disagreed upon whether the Confrontation Clause included the right of the defendant to confront his accuser face-to-face (as opposed to observing over a closed-circuit television), both the majority and the dissent agreed that the oath was an "element[] of the confrontation right."  497 U.S. at 845-46, 851, 862.  The opportunity to ask questions that a witness must answer under oath is crucial because the oath awakens the conscience and, perhaps more importantly, implicates the perjury statutes.[14] The oath is a necessary ingredient of a right to cross-examination that tests the witness' testimony for consistency against itself and the external world, as well as exposing bias, lack of capacity, credibility problems, or other deficiencies that undermine the value of the testimony to the trier of fact.  Likewise, some minimum capacity for recording and relaying truthful information is a precondition to a meaningful oath to tell the truth, which is a necessary element of cross-examination.  Although we do not attempt to define that minimum capacity, we consider it satisfied for purposes of the Confrontation Clause if the witness is able to understand the concept of the truth and his duty to present truthful information to the court.

The facts found by the Supreme Court of Ohio demonstrate that Albert's oath, and his competency to tell the truth, were each constitutionally sufficient.  The Ohio Supreme Court held that "Albert exhibited an understanding of truth and falsity and appeared to appreciate his responsibility to be truthful."  *Frazier*, 574 N.E.2d at 487.  Contrary to Petitioner's contention, this factual finding is not clearly erroneous.  Petitioner argues that the Ohio Supreme Court glossed over the faulty administration of the oath.  Because Albert was prompted to say "I do," and did not know what it meant to swear to God, Petitioner claims that the court merely "gave approval to a hollow ritual."  Petitioner further argues that Albert's incompetence and improper oath made him *de facto* cross-examination proof.  Petitioner ignores the fact that Albert stated that he would tell the truth, that it was good to tell the truth, and that he would be punished in the event that he lied.  The trial court, which was in a better position to observe Albert's demeanor, credited this testimony, as did the Supreme Court of Ohio.  Moreover, Petitioner *did* cross-examine Albert, and Albert was generally responsive to that cross-examination.  The Ohio Supreme Court's conclusion that Albert was competent to testify is not clearly erroneous.  Accordingly, we reject Petitioner's claim that Albert's testimony violated Petitioner's rights under the Confrontation Clause.

## F.       Suggestive Line-up

Petitioner claims that Albert's identification of Petitioner was based on a suggestive line-up, and therefore (1) Albert's testimony that he picked Petitioner out of a line-up, and (2) Albert's in-court identification of Petitioner both should have been suppressed.

### 1.       Preservation

Petitioner did not object to this identification testimony at trial or on direct appeal, although he did raise this challenge in his post-conviction proceedings.  The state court of appeals concluded that this claim was barred by res judicata because it could have been raised on direct appeal.  The federal district court disagreed, concluding that Petitioner's failure to raise this claim was excused because the issue was based on information that could not have been discovered during trial.  Specifically, while the district court noted that trial testimony was sufficient to put the defense on notice that a pre-trial line-up had occurred, there was nothing in the record to suggest that Petitioner

---

[14]*See, e.g.*, Fed. R. Evid. 603 (oath "awakens witness' conscience"); 18 U.S.C. § 1621(1) (oath before a competent tribunal is an element of perjury).

was the only person in the line-up with his hand bandaged or dressed in prison garb. Respondent does not challenge the district court's finding that Petitioner's claim was not defaulted, and we likewise agree that this claim is properly before us on its merits.

### 2. Merits

At trial, Albert, the seven-year-old son of victim Joann Richards, testified as an eyewitness to the stabbings. Albert testified that he went to bed at nine o'clock on the night of the murders, but came out of the bedroom later in the evening upon hearing noise. Albert watched as Petitioner (known to Albert by the nickname of "Twin") stabbed his mother. He also testified that Twin kicked his father while his father was lying on the ground. Albert told the court that, while he was watching the murders, Twin motioned to Albert to go back to his bedroom, and Albert complied. He remained there until the police came. Albert identified Petitioner as Twin by pointing to him in the courtroom, and by describing Petitioner's clothing on the day of trial. Albert also testified that, some time after the incident, he picked Twin out of a line-up, again confirming that Twin was the man sitting in the courtroom, who had killed his mother and kicked his father. Albert stated that he had seen Twin on four separate occasions before the night of the murder. Albert also testified that he thought that Twin's name was Michael, which is the name of Petitioner's brother.

The admission of evidence derived from a suggestive identification procedure violates a defendant's right to due process if the confrontation leading to the identification was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967); *Neil v. Biggers*, 409 U.S. 188, 197 (1972). In analyzing whether a defendant was denied due process of law, we conduct a two step inquiry. *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 1032 (2006). First, we assess whether the identification was unnecessarily suggestive. *Id.* If so, we then consider whether the evidence was nevertheless reliable despite the impermissible suggestiveness of the identification procedure. *Id.*

There is no real dispute that Albert's pre-trial identification of Petitioner was procured by an unnecessarily suggestive line-up. "Unnecessary suggestiveness depends 'upon whether the witness's attention was directed to a suspect because of police conduct.'" *Id.* at 469-70 (quoting 2-5 Crim. Con. Law § 5.05(2)(b) (2004)). Quite properly, the line-up contained five males of the same race who were of approximately the same age and stature. Petitioner, however, was the only one among their number who was bandaged or dressed in prison clothing. These distinctions clearly signaled out Petitioner such that the procedure contained "a very substantial likelihood of irreparable misidentification." *Neil*, 409 U.S. at 198 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

Since the procedure by which Albert identified Petitioner was unnecessarily suggestive, we must ask "whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977). *Manson* sets forth five factors for consideration in determining whether a suggestive identification was nevertheless reliable: (1) the witness' opportunity to view the suspect; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the identification; and (5) the time between the crime and the identification. *Id.* at 114; *see also Neil*, 409 U.S. at 199-200.

On balance, the *Manson* factors point to the conclusion that Albert's testimony was reliable. Albert had a good opportunity to view the suspect. He was standing at the corner of the living room, where he watched the stabbing, which occurred on the couch. Albert testified that he was able to see over the couch, and that there was light coming from his mother's room. Albert also testified that he saw his mother stabbed thirty times, which approximates the actual number of thirty-two stab

wounds. Albert thus had an opportunity to view the suspect at a reasonably close range for a period of time that was, at the least, long enough for the bulk of the crime to occur. The first *Manson* factor favors the reliability of Albert's testimony. *See Howard*, 405 F.3d at 472 (holding that the witness had "a good opportunity" to observe the defendant where the witness saw the defendant once for a "glance" from three to six feet away, once for "a split-second" from ten to fifteen feet away, and once for approximately a minute and a half from thirty to forty feet away).

The second factor also favors reliability. This Court is more likely to find an identification reliable where a witness "was able to view the assailant with a 'heightened degree of attention, as compared with disinterested bystanders or casual observers.'" *Id.* at 473 (quoting *United States v. Crozier*, 259 F.3d 503, 511 (6th Cir. 2001)). In this case, the circumstances of the eyewitness' encounter suggest that Albert was likely fixated upon the commission of the crime, as it was perpetrated against his immediate family. *Cf. Neil*, 409 U.S. at 200 (victim of the crime is likely to be an attentive observer). Moreover, Albert testified that he was concerned for his own safety, and this fact also suggests a heightened degree of attention. *Ledbetter v. Edwards*, 35 F.3d 1062, 1072 (6th Cir. 1994). It is also significant that the suspect communicated with Albert in a direct, nonverbal manner that required Albert to focus his attention on the suspect.

The third factor in inapposite. Nothing in the record suggests that Albert provided a description of the suspect to the police prior to the line-up.

The fourth factor favors a finding of reliability, although only with tempered strength. This factor seeks to identify "the level of certainty shown by the witness at the pretrial identification."[15] *Howard*, 405 F.3d at 473. Albert picked Petitioner out of a line-up, and there is no indication that he hesitated or had difficulty identifying Petitioner as the killer. On the other hand, the suggestiveness of the line-up belies any certainty demonstrated by Albert because the procedure itself suggested a clear result, and the record does not disclose the circumstances surrounding Albert's identification. Whether or not Albert's identification evinced any uncertainty, either in his words or his intonation, is not disclosed in the record. This is not a case where a witness' testimony itself provides insight into his level of certainty. *See, e.g.*, *Manson*, 432 U.S. at 115 (high level of certainty where witness testified that "[t]here is no question whatsoever" about the identification); *see also Thigpen v. Cory*, 804 F.2d 893, 897 (6th Cir. 1986) (low level of certainty evinced by witness who stated that he was "pretty sure" that the defendant was the robber). Albert's statement that "[Twin is] the man that stabbed my mother, and kicked my father" is neutral on its face. J.A. at 508-09.

The time between the confrontation and the identification also bolsters the conclusion that Albert's identification was reliable. Although Albert could not remember the exact number of days between the murder and his identification of Twin at the line-up, he stated that the amount of time was "short" when asked whether the intervening time was short or long. This delay, which occurred over a matter of days, was not long by the standards of our case law. *See, e.g.*, *Howard*, 405 F.3d

---

[15]As a matter of law, we acknowledge that the witness' degree of certainty is a relevant factor to consider in determining reliability. We note, however, that empirical evidence on eyewitness identification undercuts the hypothesis that there is a strong correlation between certainty and accuracy. *See, e.g.*, Edward Stein, *The Admissibility of Eyewitness Testimony About Cognitive Science Research on Eyewitness Identification*, 2 L., Probability & Risk 295, 296 (2003) ("Another well-established cognitive science result concerning eyewitness testimony is that an eyewitness's degree of certainty about an identification is, at best, weakly correlated with the accuracy of the identification." (citing Elizabeth Loftus & James Doyle, Eyewitness Testimony: Civil and Criminal 67 (1997))); Olin Guy Wellborn III, *Demeanor*, 76 Cornell L. Rev. 1075, 1089 (1991) (reporting studies showing that "[t]he confidence of the witness, rather than accuracy, was the major determinant of juror belief. Unfortunately, confidence bears little relation to the accuracy of an eyewitness identification" (citation omitted)); *see also Brodes v. State*, 614 S.E.2d 766, 771 (Ga. 2005) (holding that jury instruction that jurors may consider the level of certainty of the witness identification was erroneous in light of scientific evidence suggesting that such a correlation is weak).

at 473 ("Three months is not a great length of time between an observation and identification." (citing *United States v. Causey*, 834 F.2d 1277, 1286 (6th Cir. 1987))).

This case, however, presents factors that do not fit cleanly into the *Manson* analysis. Specifically, these factors are (1) that Albert was acquainted with Twin from four previous encounters before the night of the crime; (2) that Albert, at age seven, was very young; and (3) that Albert thought that Twin's name was Michael, which was the name of Petitioner's brother, who was also present at the scene of the crime. Although these factors were not identified in *Manson* (and indeed were not present on *Manson*'s facts), we conclude that they are nevertheless relevant to whether a "suggestive procedure gave rise to a substantial likelihood of irreparable misidentification." *Manson*, 432 U.S. at 107. This is so because the factors go to the reliability of the eyewitness identification, which is "the linchpin in determining the admissibility of identification testimony." *Id.* at 114. To reiterate, reliability is judged under the totality of the circumstances. *Id.* at 109. We therefore consider each factor separately as it relates to the reliability of Albert's identification testimony.

The "primary concern expressed in cases discussing the problems with eyewitness identification relates to a witness observing and subsequently identifying a stranger." *Moss v. Hofbauer*, 286 F.3d 851, 862 (6th Cir. 2002). Witnesses are very likely to recognize under any circumstance the people in their lives with whom they are most familiar, and any prior acquaintance with another person substantially increases the likelihood of an accurate identification. *Cf. United States v. Burgos*, 55 F.3d 933, 942 (4th Cir. 1995) (witnesses could reliably identify the defendant because they were familiar with the defendant before the encounter in question). Yet problems with identification testimony may exist even where the witness is familiar with the defendant. An independent basis of identification does not render the *Manson* analysis moot–the witness must still sufficiently observe the suspect in order to identify the suspect as a person the witness knows. The accuracy of identification testimony is nevertheless much higher when matching a visual observation of a suspect to an already existing memory, as opposed to the identification of a stranger, where all relevant features must be mentally recorded from scratch. *Cf. United States v. Wade*, 388 U.S. 218, 228 (1967) ("The identification of strangers is proverbially untrustworthy."). Thus, the fact that Albert already knew "Twin" from four previous occasions substantially increases the reliability of Albert's identification of Petitioner at trial and at the suggestive line-up.

Albert's age, however, counsels against a finding of reliability. "Studies show that children are more likely to make mistaken identifications than are adults." *Arizona v. Youngblood*, 488 U.S. 51, 72 n.8 (1988) (Blackmun, J. dissenting) (citing Cohen & Harnick, *The Susceptibility of Child Witnesses to Suggestion*, 4 Law & Hum. Behav. 201 (1980)). Age, like any factor that affects the ability of the witness to record and recount information accurately, is undoubtedly relevant to the reliability of the eyewitness identification. *Cf. Thigpen*, 804 F.2d at 897 (noting that although the witness was not drunk or under the influence of drugs, the stress of being robbed may have affected the witness' ability to make an accurate identification).

More troubling than Albert's age, however, is the fact that Albert thought that Twin's name was Michael. Where a witness is under a mistaken belief about facts that are closely connected to the facts surrounding the identification, that mistaken belief may cast aspersions on the witness' identification testimony. In this case, however, this fear is somewhat ameliorated by evidence suggesting that Albert knew the difference between Petitioner and Petitioner's brother Michael, but merely thought that Petitioner's name was *also* Michael. Judge Nugent questioned Albert for this exact reason:

> Judge Nugent:     How many people were [at the house on the night in question]?
> The Witness:        Three.

Judge Nugent:      All right.  Twin, Michael, and Day-Day?[16]
The Witness:       Yes.
Judge Nugent:      Which one did you see stabbing your mom?
The Witness:       Twin.
Judge Nugent:      All right.  Now, who was that?
The Witness:       Twin.
Judge Nugent:      I thought you told us his name is Michael?
The Witness:       His name is Michael.
Judge Nugent:      All right.  There is another Michael there, too?
The Witness:       (indicating)
Judge Nugent:      Two Michaels?
The Witness        (indicating)
Judge Nugent:      And Day-Day?
The Witness:       Yes.

J.A. at 517-18.

Looking at the totality of the evidence, we cannot conclude that Albert's testimony was unreliable.  Albert's prior familiarity with Petitioner and the application of the *Manson* factors counsel strongly in favor of reliability; although Albert's age and mistaken belief as to Petitioner's name are cause for pause, they are not sufficient to render the evidence of the suggestive line-up so unreliable under the totality of the circumstances as to constitute a violation of Petitioner's right to due process.  The same analysis applies to Albert's in-court identification of Petitioner.  *See United States v. Hill*, 967 F.2d 226, 232 (6th Cir. 1992).

Petitioner additionally argues that he was deprived of the effective assistance of counsel by his trial counsel's failure to object to the impermissibly suggestive evidence.  Our analysis of the merits of Petitioner's suggestive-identification claim provides a sufficient basis for rejecting Petitioner's ineffective assistance of counsel claim, because Petitioner cannot demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

## G.    Ineffective Assistance of Counsel at Mitigation

Petitioner claims that he was deprived of the effective assistance of counsel during the mitigation phase of his trial because his trial counsel failed to collect and present certain mitigating evidence.  We agree with the parties and the district court that this issue is properly preserved for review.

### 1.    Evidence Presented and Omitted

The analysis must begin by considering what evidence trial counsel presented on Petitioner's behalf.  The evidence presented at Petitioner's mitigation hearing consisted of three witnesses, and Petitioner's unsworn statement.  First, James Heiseler was called.  Heiseler was Petitioner's boss at Lemco Industries, where Petitioner worked prior to his arrest for the charges that form the basis of this case.  Over a short time period that spans sixteen pages of trial transcript, Heiseler testified that Petitioner was a good employee, that he had enough intelligence and ability to handle his work, that he eventually became assistant foreman, and that there were no disciplinary actions against Petitioner, although he had once heard a rumor about Petitioner drinking on the job.

---

[16]"Day-Day" was a nickname for Evans, who was also indicted for this crime.

Petitioner next called Dr. Kurt Bertschinger. Dr. Bertschinger testified that he had met with Petitioner on one occasion. (Dr. Bertschinger's report reveals that Dr. Bertschinger had spent only one and a half hours with Petitioner.) Dr. Bertschinger, in making his evaluation, relied on a social history supplied by the court psychiatric clinic, which included a psycho-social history by Rita Haynes. Dr. Bertschinger also relied on competency reports prepared for this trial and a previous trial at which Petitioner was charged with and convicted of homicide. These reports were prepared in connection with insanity defenses that were ultimately abandoned in each case. Dr. Bertschinger testified that Petitioner suffered from anti-social personality disorder, and that Petitioner had "illogical or poor judgment, that he had an inability to shift focus appropriately when aroused according to environmental demands. . . . [H]e's aloof, distrustful, wary of others." J.A. at 595. Dr. Bertschinger also testified that Petitioner had an "adjustment disorder with depressed moods," which "signifies a variety of maladjustments over long periods of time," manifesting itself by examples such as "truancy from school, running away behavior, acting out behavior in school, disciplinary problems, violations of social norms, often an inability to form close personal attachments, [and] sometimes difficulty empathizing or feeling emotion, although there's some question about that." J.A. at 594. Dr. Bertschinger stated that Petitioner had malingering, which "basically means that one is attempting to feign an illness," which "is often done for what we might call the secondary gain; whatever might be derived from feigning an illness." J.A. at 595, 597. Dr. Bertschinger stated that he was aware that Petitioner had made attempts on his own life, although this testimony was not developed. This was significant, in Dr. Bertschinger's opinion, to supporting the diagnosis of depression. In response to judicial questioning, Dr. Bertschinger stated that Petitioner was not suffering, in psychiatric terms, from a mental disease or defect, and that Petitioner's intelligence was in the average range.

Petitioner's third witness was his grandmother, Martha Frazier ("Ms. Frazier"). Ms. Frazier testified that when Petitioner first came to live with her, he was in a disturbed state of mind because of the loss of his parents and his brother over a two-month period. After direct and cross-examination, judicial questioning prompted Ms. Frazier to reveal that Petitioner's father had died from an overdose of heroin, and Petitioner's mother had died from asthma. Ms. Frazier also told the story of the shooting death of Petitioner's brother.[17] Ms. Frazier testified that Petitioner was a good father, and said that, to her knowledge, Petitioner and his wife were happy, although this testimony showed signs of reservation.[18]

Petitioner also gave an unsworn statement. He testified that he was "raised by two of the most beautiful parents you could ever meet." J.A. at 630. He testified that he felt bad for the victims' families, and that he regretted his role in the "nightmare of March 26, 1987," which would torment him every night. J.A. at 632. He asked the court for mercy, and stated that he had tried to better himself educationally and emotionally during his previous years in prison.

The trial court sentenced Petitioner to death, which was affirmed by the Ohio Supreme Court. The trial court found that Petitioner's mental ability was average, that he was not suffering from a mental disease or defect, and that his family history was "troubled at best." J.A. at 575. The panel went through all of the mitigating factors outlined in O.R.C. § 2929.04, and concluded that "there is no credible evidence to support any such factor." J.A. at 575. The Ohio Supreme Court,

---

[17]As Ms. Frazier recounted the story, Petitioner's brother had, out of charity, given a stranger five dollars to purchase a sandwich from a public food vendor, and the stranger, after purchasing the sandwich, refused to return the change to Petitioner's brother. An argument developed, and Petitioner's brother said he was not going to leave without his change, at which point the stranger pulled out a gun and shot Petitioner's brother.

[18]Specifically, Ms. Frazier testified: "Well, they – they always – every time they will come around me, they was always happy with one another. They never – I never seen them complaining about anything, but I wasn't –" J.A. at 622. She was cut off by further questioning at this point.

conducting their independent weighing of the aggravating and mitigating factors pursuant to O.R.C. § 2929.05, concluded:

> From [the evidence at trial] it can be seen that two aggravating circumstances were established beyond a reasonable doubt. Proceeding now to a consideration of mitigating factors, we find that the victims of the offenses did not induce or facilitate these acts; appellant was not under duress, coercion or strong provocation; there was no evidence establishing that appellant at the time of the offense was suffering from a mental disease or defect or lacked substantial capacity to appreciate the criminality of his act or to conform his conduct to the law; appellant was twenty-eight years of age at the time of the offense, thus he was not a youthful offender; appellant had a prior criminal record; and appellant acted as principal in the killing of Joann Richards. Appellant also gave a statement at the mitigation hearing. From the foregoing evidence presented in mitigation, nothing is found to in any way mitigate the nature of appellant's acts. Based upon these considerations, we find that no mitigating factors were established and, thus, the aggravating circumstances clearly outweigh evidence of mitigation beyond a reasonable doubt.

*Frazier*, 574 N.E.2d at 491-92.

In post-conviction proceedings, Petitioner principally relied on two sources of evidence in support of his claim that his counsel were constitutionally ineffective at his sentencing hearing. First, Petitioner offered the psychological and neuropsychological evaluation of Dr. Jeffrey Smalldon. Second, he offered the affidavit of James F. Crates, a mitigation specialist and forensic biographical investigator.

Dr. Smalldon's report begins by pointing to the insufficiency of the evaluations that formed the basis of Petitioner's mitigation claim at sentencing. He notes that the reports upon which Dr. Bertschinger relied offered no information about Petitioner's history of physical abuse. In terms of the 1987 competency report prepared by Dr. Pagano (one of the reports upon which Dr. Bertschinger relied), Dr. Smalldon remarked that Dr. Bertschinger relied upon a report conducted ten years earlier. Moreover, that report demonstrated that Petitioner had a twenty-five point difference between his performance IQ and his verbal IQ, which, because the discrepancy was greater than fifteen points, "is considered a serious warning sign that may well be indicative of an underlying learning disability or some degree of functional brain impairment." J.A. at 1359. Noting that functional brain impairment has been considered by courts to be a mental defect, Dr. Smalldon observed that no one ever assessed Petitioner for functional brain impairment. This failure is more egregious to Dr. Smalldon due to the fact that during one of Petitioner's suicide attempts he sustained a self-inflicted bullet wound to his left temple from a .38 caliber pistol. Dr. Smalldon opined that previous reports concerning Petitioner's social history missed the signs of physical abuse in Petitioner's family, such as the fact that Petitioner (and his mother and siblings, as revealed by Crates' affidavit) were frequently beaten with a baseball bat or otherwise abused. (Petitioner, at least at the time of Dr. Smalldon's report, did not consider this treatment to be "abuse.") Dr. Smalldon recounted that Petitioner grew up in a social environment saturated with violence, and that Petitioner had, for example, seen his father fire a pistol at a motorist for cutting him off while driving. Dr. Smalldon concluded:

> Mr. Haliym is the product of a highly unstable family crucible where violent behavior was part of the norm, where antisocial attitudes were in the air everyone breathed, and where the streets functioned as a kind of learning annex where most of the lessons had to do with survival.
>
> . . .

> My diagnostic impression is that Mr. Frazier has a mild to moderate degree of functional brain impairment, most likely related to the incident during the 1970's when a gun discharged into his left temple region; that he has a longstanding, low-grade depression (Dysthymia); that he has a history of alcohol and polysubstance dependence that began when he was still in his early-teens; [and] that he has a personality disorder with paranoid and antisocial features.

J.A. at 1389-90.

Crates' affidavit corroborated and expanded upon Petitioner's history of abuse, and criticized the manner in which Petitioner's trial counsel conducted Petitioner's defense. Crates stated that head injuries were a "red flag" to those in the area of psycho-social investigation, signifying the need for additional testing, and that these records would have been available from the hospital–in fact, the competency report that Petitioner's trial counsel submitted to the trial court mentioned that Petitioner had shot himself in the head. Crates also conducted interviews with Petitioner's brothers and sisters, wife, aunt, and Ms. Frazier. These interviews were generally consistent in their description of severe abuse. For example, Petitioner's sister Valerie recalled an incident where Petitioner and his brother were forced to stand naked in the bathtub while their father beat them with a baseball bat. Petitioner's aunt recalled that Petitioner's father had broke several of Petitioner's mother's ribs on one occasion; Petitioner's sister recalled that Petitioner was beaten with sticks, extension cords, a baseball bat, and at one point taken to Connecticut to live with his mother's family to avoid violence from his father.

Crates also stated that, contrary to what counsel did in this case, it was standard practice not to request a presentence investigation report ("PSR") in capital cases. The PSR in this case, in Crate's opinion, was inadequate in multiple respects, primarily in that it did not contain the information concerning Petitioner's family circumstances, specifically the history of severe violence.[19] Crates concluded that, in his opinion, counsel was inadequate in that they did "very little" to prepare and "quite simply, what they did, they did because it was convenient." J.A. at 1347. "The plethora of information which would have been available to the trier of fact, if someone involved in this matter would have endeavored to effectively investigate Mr. Haliym's psychosocial history, is astounding."[20] J.A. at 1347.

### 2.   Analysis

*Strickland* establishes the governing legal standard for analyzing this claim. Under *Strickland*, a petitioner claiming ineffective assistance of counsel must show "that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*, 466 U.S. at 687).

---

[19]In fact, the Mitigation of Death Penalty Report prepared by the Court Psychiatric Clinic, far from reporting Petitioner's history of family violence, instead informed the court that "[t]he defendant stated that he was not physically or sexually beaten or abused as a child." Letter from Jonathan P. Rosman, M.D., to the Honorable Donald C. Nugent regarding Mitigation of Death Penalty Report (Sept. 8, 1987) ("Mitigation Report"). The letter further concluded, "with reasonable medical certainty," that "defendant was not suffering from a mental disease or defect at the time of the crimes for which he is being convicted." *Id.*

[20]As the foregoing discussion makes clear, the Dissent is simply wrong in its assertion that "the witnesses presented at trial covered all aspects of Haliym's life," and that Ms. Frazier "related a lot of Haliym's family background." Dissenting Op. at 34. As discussed below, this Circuit has consistently considered evidence of family abuse highly relevant to mitigation.

### a.          Deficient Performance

To establish deficient performance, a petitioner must show that his attorney's conduct "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Courts will not, however, second-guess the strategic choices of trial counsel if they were made after a thorough investigation:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91.

Because the Ohio courts have not issued an opinion on the merits of the issue before us, there is no state court decision to which we must defer in applying the *Strickland* standard. *Joseph v. Coyle*, 469 F.3d 441, 469 (6th Cir. 2006). On direct appeal, Petitioner challenged his counsel's performance in commenting on certain records that were introduced during mitigation. *Frazier*, 574 N.E.2d at 489. In post-conviction proceedings, Petitioner did bring this claim, *inter alia*, on the theory asserted here, but the Ohio courts did not address the merits of Petitioner's ineffective assistance of counsel claim in a reasoned opinion, instead dismissing the claim on the ground of res judicata.

*Strickland* imposes a duty upon counsel to conduct a "thorough investigation of the law and facts." *Id.* at 690. In determining whether counsel's investigation in preparation for the mitigation proceeding was reasonable, the "focus [is] on whether the investigation supporting counsel's decision not to introduce mitigating evidence [of the type not produced] *was itself reasonable*." *Wiggins*, 539 U.S. at 523.

An attorney is not expected to follow up on every possible avenue of inquiry regardless of how improbable it is that that avenue would lead to useful evidence. Yet in examining the investigation that counsel made, "a court must not consider only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. In assessing counsel's performance, a court must thus consider whether counsel adequately followed up on the "leads" that were available to them. *See id.*; *see also Harries v. Bell*, 417 F.3d 631, 639 (6th Cir. 2005) ("[I]nterviews conducted by Harries's counsel . . . produced viable leads regarding Harries's poor mental health and troubled family background. Counsel's failure to follow these leads leaves no 'room for debate' that their truncated investigation was deficient.").

In this case, Petitioner's counsel failed to follow up with obvious avenues of investigation that would have produced valuable mitigating evidence. The evidence that Petitioner's counsel failed to procure can be categorized into three types: (1) evidence of Petitioner's abusive and violent childhood; (2) evidence that Petitioner had suffered intense grief over the loss of his family; and (3) evidence that Petitioner potentially suffered from a mental defect.

Petitioner's counsel failed to discover highly relevant mitigating evidence of Petitioner's family background, the existence of which was suggested by other evidence known to counsel. There is no evidence that Petitioner's attorneys conducted even the most basic interviews with

Petitioner's siblings for the purpose of investigating Petitioner's family background; doing so would have produced ample evidence that Petitioner grew up in a deeply troubled home.[21]  Petitioner's attorneys were or should have been on notice that an investigation into Petitioner's family background would have been fruitful.  Dr. Rosman's Mitigation Report, which Petitioner's counsel possessed, stated that Petitioner's father had died of a drug overdose.  Mitigation report, *supra*.  The death of Petitioner's father by a drug overdose would have put competent counsel on notice that further investigation was required.[22]  It is not the usual case where a parent copes with an addiction as serious and controlling as a heroin addiction without repercussions, often serious repercussions, being felt by the remaining family members.  Had minimal investigation into Petitioner's family circumstances been conducted, valuable mitigation evidence would have been forthcoming.  Nor can the relevance of Petitioner's family history of abuse be gainsaid; the Sixth Circuit has frequently considered this an important mitigation factor.  *See, e.g.*, *Harries*, 417 F.3d at 639 (noting that the petitioner and the petitioner's family were exposed to violence and considering this information relevant to mitigation); *Hamblin v. Mitchell*, 354 F.3d 482, 490 (6th Cir. 2002) (considering family violence and instability in the petitioner's home as relevant mitigating evidence); *cf. Durr v. Mitchell*, 487 F.3d 423, 436 (6th Cir. 2007) (discussing the fact that the petitioner came from a stable home and concluding that the omitted evidence "does not reflect an upbringing that would give rise to an ineffective assistance of counsel claim"); *Foley v. Parker*, __ F.3d __, 2007 WL 1437435, at *3 (6th Cir. 2007) (finding that the petitioner could not demonstrate prejudice where his counsel failed to interview family and friends and noting that the petitioner had not "come forward with evidence of a difficult childhood or mental problems").

To the extent that evidence of Petitioner's troubled childhood did come before the court, Petitioner's attorneys did not highlight this information; they instead presented evidence that was inconsistent with the fact that Petitioner was abused throughout childhood.  Petitioner's attorneys allowed Petitioner's statement that his parents were "two of the most beautiful parents you could ever meet" to go uncontradicted, save for the testimony about Petitioner's father's drug addition elicited by the trial court.  Petitioner's attorneys also submitted the Mitigation Report, which specifically denied evidence of physical abuse.  This decision is difficult to justify from a strategic perspective.  *Cf. State v. Drummond*, 854 N.E.2d 1038, 1077 (Ohio 2006) (upholding the sentence of death where "[the defendant's] character offers nothing in mitigation, and his history and background also provide little in the way of mitigation.  [The defendant] was raised in a home where both parents loved and supported him").

Petitioner's attorneys also failed to highlight the impact that the loss of Petitioner's family had upon him.  Although Ms. Frazier did touch upon this topic in a cursory fashion, her testimony was limited in this respect to stating, three separate times, that Petitioner was "very disturbed" when

---

[21] In his affidavit, Crates stated that although the memories were painful for Petitioner's family members, "they struggled through them because they love their brother.  And they would have been willing to do the same in 1987." J.A. at 1347.

[22] The fact that the Mitigation Report also reported that Petitioner stated that he was not abused did not excuse counsel from conducting an investigation into this area when other evidence suggested that it was a relevant area of inquiry.  *See Rompilla v. Beard*, 545 U.S. 374, 377 (2005) ("We hold that even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial.").  Likewise, *Rompilla* refutes the Dissent's attempt to minimize the evidence of Petitioner's abuse by relying on the fact that Petitioner claimed that he was not abused.  *See* Dissenting Op. at 35 ("Haliym himself contradicted [evidence of beatings] in his own unsworn statement, when he said he was raised by 'two of the most beautiful parents you could ever meet.'  Haliym even denied to Dr. Smalldon that he was ever abused.").

he came to live with Ms. Frazier.[23]  Had Petitioner's counsel followed up on this line of inquiry, they would have been led to testimony suggesting that these deaths were a profound event for Petitioner.  Petitioner never used heroin before the death of his father.  Shortly after his father passed away, Petitioner experimented with using heroin intravenously as a way into his father's subjective world.  The gunshot to Petitioner's head also happened just months after his three family members died.  According to Dr. Smalldon, "the impact of [Petitioner's] losing his mother, his father, and his oldest brother during a very short time period in his mid-teens can[not] be overestimated."  J.A. at 1390.  This too would have been relevant mitigating evidence, and would not have been cumulative of Ms. Frazier's lone statements that Petitioner was "disturbed" in the wake of the death of three family members.

Perhaps most importantly, a more thorough investigation would have led to some evidence that Petitioner had a mental defect.  Petitioner's attorneys were on notice that Petitioner had shot himself in the left temple, which should have strongly suggested the need to investigate whether Petitioner had a mental defect.  Instead of conducting this investigation, Petitioner's attorneys put before the trial court Dr. Bertschinger's testimony that none of the mental disorders with which Petitioner was diagnosed could be considered a mental disease or defect, at least for psychiatric purposes.

Because there was significant mitigating evidence that counsel should have discovered based on the evidence that was available to them, Petitioner's case is closer to the constitutionally ineffective assistance of counsel rendered in *Hamblin* and *Harries* than, as the Respondent argues, to the adequate representation afforded the defendant in *Smith v. Mitchell*, 348 F.3d 177, 204 (6th Cir. 2003).  In *Hamblin*, this Court found counsel's performance deficient at the mitigation stage where counsel failed to obtain family or social history.  The key evidence that went undiscovered in *Hamblin* was similar to the evidence omitted in this case:

> Hamblin grew up in extreme poverty and neglect, surrounded by family violence and instability, had a poor education and likely suffers from mental disability or disorder. . . . His father was very violent and beat Hamblin's mother and Hamblin regularly.

*Hamblin*, 354 F.3d at 490.

True, Hamblin's counsel's performance was arguably more substandard than counsel's performance in the present case, as counsel in *Hamblin* obtained no psychological report, presented only one witness besides Hamblin himself, and made a cursory closing argument.  *Id.* at 491.  This modest difference in the degree of counsel's deficient performance does not distinguish *Hamblin*, as Petitioner's counsel's failure is identical in kind.  That is, like counsel in *Hamblin*, Petitioner's counsel failed to collect available, relevant evidence that a reasonably adequate investigation would have uncovered.  *See Wiggins*, 539 U.S. at 534 (holding that counsel's performance was deficient where counsel terminated an investigation after the evidence uncovered suggested that further investigation would lead to more evidence).

Likewise, counsel's investigation here is similar to the investigation that constituted deficient performance in *Harries*:

> [W]e cannot escape the conclusion that Harries's counsel failed to conduct a constitutionally adequate investigation.  Counsel limited their investigation to contacting by telephone Harries's mother and brother, sending requests for information to some of the institutions in which Harries had been confined, and

---

[23]Additionally, a report from Dr. Rosman submitted to the court stated that Petitioner was "very depressed." J.A. at 906.

interviewing Harries's codefendant, and two state witnesses. Although counsel requested two court-ordered competency evaluations, they declined to seek the assistance of a mental health expert or conduct a thorough investigation of Harries's mental health, even after Harries's mother alerted them that Harries suffered from mental illness. Nor did counsel adequately investigate Harries's family background, despite indications of Harries troubled childhood.

417 F.3d at 638.

As occurred in *Harries*, it appears as though Petitioner's attorneys gathered only the most limited information from Petitioner's family, even though the witness that they spoke to, Ms. Frazier, could have alerted Petitioner's attorneys to Petitioner's troubled background. Although Petitioner's counsel did present the testimony of Dr. Bertschinger, the limited time that Dr. Bertschinger spent with Petitioner–a mere hour and a half–sharply hindered his ability to make any independent analysis of Petitioner's mental health. Thus, the data on which Dr. Bertschinger's report relied was limited almost exclusively to the report of Rita Haynes of the Court Psychiatric Clinic, and the competency and sanity reports of Dr. Pagino. Petitioner never received an independent psychiatric analysis.[24]

On the other hand, counsel's investigation in this case falls far short of the preparations deemed adequate by this Court in *Smith*, 348 F.3d at 204. Smith claimed that counsel had not adequately conducted an investigation before the mitigation hearing. *Id.* at 200. The Court disagreed. Counsel presented five witnesses at mitigation, including Dr. Schmidtgoessling, who "presented a comprehensive picture of Smith's family, social, psychological background, based upon extensive review of '[n]umerous sources of information,' which included not only psychological tests, but also interviews, hospital records, school reports, and social services records." *Id.* at 204 (alternation in original). More importantly, the Court noted that "we are at somewhat of a loss in trying to discern what evidence Smith believes was *not* presented at mitigation." *Id.* at 200-01. *Smith* distinguished *Williams v. Taylor*, 529 U.S. 362 (2000) and *Glen v. Tate*, 71 F.3d 1204 (6th Cir. 1995) as cases where the court identified mitigation evidence that existed but was not presented. *Id.* at 203-04; *see also Spisak v. Mitchell*, 465 F.3d 684, 707 (6th Cir. 2006) (rejecting the petitioner's claim that counsel was ineffective for failing to discover specific instances in the petitioner's childhood where counsel presented an "extensive social history . . . based on interviews with Defendant, his father, mother, and two sisters as well as various medical records" and "various mental health experts" discussed the petitioner's childhood). By contrast, in Petitioner's case the evidence that existed but was not discovered and presented is clear: The evidence of Petitioner's violent home, his abusive childhood, a more detailed description of the

_____

[24] The Dissent attempts to gloss over the deficiencies in Dr. Bertschinger's evaluation by arguing that "Dr. Bertschinger did not say that he needed more time to diagnose Haliym for the case." Dissenting Op. at 34. Of course, whether counsel adequately investigated the issue of whether Petitioner suffered from a mental disease or defect is not for Dr. Bertschinger to determine; instead, the analysis must focus on what investigatory steps counsel took, what steps they failed to take, and whether the evidence available to counsel suggested that a more thorough investigation was necessary–that is, whether counsel's decision to not conduct further investigation was reasonable. *Strickland*, 466 U.S. at 690-91. As discussed below, counsel's decision not to follow up on evidence of Petitioner's head trauma and their consequent failure to discover evidence of functional brain impairment was clearly unreasonable. *See Frazier v. Huffman*, 343 F.3d 780, 794-96 (6th Cir. 2003). This failure in all likelihood stemmed directly from Dr. Bertschinger's truncated investigation.

The Dissent also finds it significant that "no one questions the qualifications of Dr. Bertschinger." Dissenting Op. at 34. While this statement is true, it is also a *non sequitur.* One need not question Dr. Bertschinger's qualifications to conclude that the investigation that he made in relation to the preparation of the PSR did not fully discharge counsel's obligation to investigate whether Petitioner suffered from a mental disease or defect. Likewise, the Dissent's assertion that "Dr. Smalldon is no better qualified than Dr. Bertschinger" is similarly irrelevant. Dissenting Op. at 34. The question of whether counsel's preparations were constitutionally adequate turns on the thoroughness of the investigation, not on the relative credentials of two qualified experts.

intense psychological impact Petitioner suffered due to the loss of three members of his family, and evidence of a possible mental defect stemming from serious head trauma sustained during a suicide attempt.

We also draw support from *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003), which involved a habeas petition by an inmate sentenced to death. Counsel in *Frazier* were aware of the petitioner's prior injury from a fall off a ladder yet failed to investigate the incident or present mitigating evidence relating to Frazier's brain injury. *Id.* at 794. The evidence suggested that Frazier's brain injury led to "functional brain impairment," the same condition arguably afflicting Petitioner in this case.[25] *See id.* The Court concluded that Frazier received ineffective assistance of counsel, as there was "no rational trial strategy that would justify the failure of Frazier's counsel to investigate and present evidence of his brain impairment."[26] *Id.*; *see also id.* at 796 ("[C]ompetent trial counsel for Frazier would have realized that their client had everything to gain and nothing to lose by introducing evidence of his brain injury at the penalty phase of the case."). Petitioner's counsel in the instant case likewise failed to diagnose Petitioner's brain injury, despite the fact that they knew or should have known that Petitioner shot himself in the head. It was counsel's responsibility to investigate the possibility that this trauma led to a mental defect. *See id.* at 794. Like the *Frazier* court, we cannot conceive of a strategic reason for failing to develop and present evidence of this brain injury and its potential medical implications to the trial court.[27] This evidence, if developed, would have been relevant mitigating evidence under Ohio law. *Id.* at 798.

Further reinforcing our conclusion is the fact that counsel's performance fell short of several of the American Bar Association's guidelines. *See* American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev'd ed. 2003), *reprinted in* 31 Hofstra L. Rev. 913 (2003) (hereinafter "ABA Guidelines"). American Bar Association standards have long been considered guides to the reasonableness of counsel's conduct. *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (quoting *Wiggins*, 539 U.S. at 524).[28] ABA Guideline 10.7 states that counsel has "an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." ABA Guidelines, *supra* at 1015. The commentary to this guideline clarifies that this investigation should include "members of the client's immediate and extended family;" medical history, which includes physical injury and neurological damage; and "family and social history," which includes "physical . . . abuse, . . . domestic violence . . . exposure to criminal violence, [and] the loss of a loved one." *Id.* at 1019, 1022. In short, the ABA Guidelines and the commentary thereto explicitly recognize that competent counsel will investigate and discover all the evidence that Petitioner's counsel failed to unearth.

---

[25] Consistent with the post-conviction evidence in this case, the *Frazier* court noted that head trauma to the frontal lobe can affect "impulse control, social judgment and reasoning." 343 F.3d at 794.

[26] As *Frazier* makes clear, evidence of functional brain impairment is relevant mitigating evidence. Thus, the Dissent's statement that Dr. Smalldon "did not say that Haliym was retarded" or "that Haliym was suffering from psychosis" misses the point; evidence of brain damage is relevant even if it does not result in retardation or psychosis. Dissenting Op. at 35.

[27] The district court excused this failure, noting that Petitioner acted uncooperatively towards mental health practitioners. Petitioner's lack of cooperation is not dispositive. The evidence shows that, after being admonished by the judge to cooperate, Petitioner *did* cooperate with mental health practitioners, and there is nothing to suggest that attempting to have Petitioner examined by additional experts would have been futile.

[28] Considering counsel's performance in light of the current ABA Guidelines is proper despite the fact that the ABA Guidelines were issued well after Petitioner's trial, as the ABA Guidelines represent "a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases." *See Hamblin*, 354 F.3d at 487 (discussing the court's reliance on 1989 ABA Guidelines issued after the petitioner's trial).

We also note that counsel's failure to develop these areas of mitigation was unlikely the result of a strategic choice. Despite the availability of funding to procure experts chosen by Petitioner at the mitigation phase, see O.R.C. § 2929.024 (providing funding indigent defendants), Petitioner's attorneys nevertheless relied upon the presentence report of Dr. Rosman, who was appointed by the court pursuant to O.R.C. § 2929.03(D). At trial, this report, along with the inadequate testimony of Dr. Bertschinger, took the place of an expert report and investigation conducted by an expert of Petitioner's choosing. Had Petitioner's counsel taken an active role in procuring an expert to investigate Petitioner and author a report for mitigation, evidence of Petitioner's social history and brain injury would likely have come before the trial court. We can fathom no strategic reason for Petitioner's counsel's failure in this regard.[29] *See Glenn*, 71 F.3d at 1209 (faulting counsel for requesting a presentence report under O.R.C. § 2929.03(D)); *see also* ABA Guidelines, *supra*, at 1073 ("Because Ohio provides capital defendants the right to reasonably necessary investigation, experts, or other assistance for trial and penalty phases, capital counsel who request a presentence report instead may be ineffective for doing so." (citing *Glenn*, 71 F.3d at 1209-10)); Affidavit of James F. Crates, Mitigation Specialist — Forensic Biographical Investigator, (Sept. 18, 1996) (J.A. at 1343) ("Accepted standards of Capital practice dictate that as a matter of strategy at Mitigation, defense counsel *should not* request a Court Ordered Presentence Investigation Report. . . . The obvious concern with requesting such an instrument is the lack of control which counsel has over the information which is made available to the trier of fact.").

In sum, counsel's investigation was clearly limited. We cannot conclude "that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 691. Trial counsel failed to discover important mitigating information that was reasonably available and suggested by information already within their possession. When Petitioner's counsel failed to develop this information and present it to the trial court, their performance fell below an objective standard of reasonableness.

### b.      Prejudice

To show prejudice, a petitioner must show that there is a reasonable probability that, but for the errors of counsel, his sentence would have been different. *Wiggins*, 534 U.S. at 534 (quoting *Strickland*, 466 U.S. at 694). "In assessing prejudice, [a court] reweigh[s] the evidence in aggravation against the totality of available mitigating evidence." *Id.* In this case the aggravating factors include the history and background of Petitioner, and the nature and circumstances of the offense with which Petitioner was charged. Specifically, Petitioner had already been convicted of a homicide, and the crime was committed in the context of a robbery and/or burglary, where there were two or more people killed, and where Petitioner was the principal killer with respect to one of the persons murdered.

In terms of mitigation, after a thorough investigation, counsel could have placed significant mitigating evidence before the factfinder. Petitioner came from a poor and violent household. His home life was saturated with violence, which was frequently employed by his father against him and his family. During his teen years, Petitioner lost his father, mother, and brother in the course of three months. The incident affected him profoundly, and shortly thereafter, he tried heroin, leading to a drug addition. This same period was also marked by depression, which caused Petitioner to inflict upon himself a serious brain injury, in the form of a gunshot wound to the left temple. This caused him to sustain brain damage, specifically, functional brain impairment. Individuals with this

---

[29]The Ohio Supreme Court summarily rejected Petitioner's claim that counsel was ineffective merely for requesting a PSR. *See Frazier*, 574 N.E.2d at 491; *accord Durr*, 487 F.3d at 432-34 (holding that counsel's failure to request the appointment of a psychologist did not *ipso facto* render their performance ineffective). We need not take a position on the propriety of this holding; we merely consider the decision to request a PSR relevant to the overarching question of whether counsel's investigation in preparation for mitigation was constitutionally deficient.

condition can be expected to demonstrate "greater than normal difficulties with impulsivity, judgment, and problem solving . . . processing of verbal instructions, and shifting from one mental set to another in the course of trying to solve a problem which requires logical analysis." J.A. at 1387. As in *Wiggins*, here the "mitigating evidence counsel failed to discover and present . . . is powerful." 539 U.S. at 534. Had this information been placed before the trier of fact, there is a reasonable probability that they would have returned with a different sentence. *See id.* at 536.

Given that this case was tried before a three-judge panel instead of a jury at mitigation, the finder of fact was allowed to submit questions to the witnesses. To the extent that these questions allow us to glean any insight into the factfinder's thought processes, the record supports the conclusion that the mitigating evidence that Petitioner's counsel failed to proffer was significant. Judge Nugent, one member of the three judge panel, repeatedly questioned Dr. Bertschinger about whether the disorders with which Dr. Bertschinger diagnosed Petitioner could constitute a mental disease or defect.[30] Judge Nugent first asked Dr. Bertschinger if it was fair to conclude that Petitioner was not suffering from a mental disease or defect from the absence of any such statement in Dr. Bertschinger's report. Dr. Bertschinger responded that these terms had a different meaning in legal and psychiatric language. Judge Nugent reiterated his question about whether Petitioner suffered from a mental disease or defect. Dr. Bertschinger replied that he "[didn't] know anything in the statute that says antisocial personality disorder could not be considered [a] mental disease or defect." J.A. at 612. Still not satisfied, Judge Nugent clarified what psychiatrists meant by "mental defect," and then confirmed with Dr. Bertschinger that Petitioner's afflictions did not constitute a mental defect; he then conducted a similar line of questioning with respect to what constitutes a mental disease. Dr. Bertschinger confirmed that, in psychiatric terms, Petitioner was not suffering from either a mental disease or defect. Had Petitioner's expert instead responded that Petitioner suffered from functional brain impairment, stemming from a gunshot wound to the left temple, which could be considered a mental disease or defect, there is a reasonable probability that the three-judge panel would have changed their assessment of the mitigation evidence.[31]

An examination of the decision of the Ohio Supreme Court also indicates that Petitioner was prejudiced by his counsel's deficient investigation. The Ohio Supreme Court, conducting their independent weighing of the aggregating and mitigating factors under O.R.C. § 2929.05, found that "nothing . . . in any way mitigate[s] the nature of [Petitioner's] acts." *Frazier*, 574 N.E.2d at 492. It cannot be said that nothing in the history of Petitioner's life in any way mitigates an assessment of his culpability for the crime he committed. Had this information been presented to the trial court, there is a sufficient likelihood that the result would have been different. *See Rompilla*, 545 U.S. at 393.

---

[30]Ohio Revised Code § 2929.04(B) sets forth the mitigating factors that the court "shall consider." Sections 2929.04(B)(1)-(6) set forth specific considerations, including § 2929.04(B)(3): "Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law."

[31]This analysis also suggests that, contrary to the district court's conclusion, the evidence of brain damage that Petitioner's counsel failed to present was not cumulative. The district court held that Dr. Bertschinger's testimony covered the same evidence that Petitioner claimed was not presented, because Dr. Bertschinger testified that there was "a feeling that [Petitioner] had illogical or poor judgment, that he had an inability to shift focus appropriately when aroused according to environmental demands." J.A. at 307. This evidence is not equivalent to what Petitioner failed to present for two reasons. First, Petitioner's brain disorder, according to Dr. Smalldon, involves difficulties with impulse control, something that Bertschinger never stated–and something that is highly relevant to culpability. Second, Petitioner could have demonstrated that these characteristics derived from a brain condition that could be characterized as a mental disease or defect; a condition that has a physical basis, as opposed to the disorders about which Dr. Bertschinger testified. In light of § 2929.04(B)(3) and the Ohio trial court's interest in whether Petitioner was suffering from a mental disease or defect, this evidence was not cumulative of Dr. Bertschinger's testimony.

In sum, had counsel conducted a thorough investigation, they could have presented a dramatically different picture of Petitioner's life than the picture presented at sentencing. As the trial court and the Ohio Supreme Court were presented with almost no mitigating evidence supporting a sentence other than death, it is not entirely surprising that each court concluded that the balance of factors favored the death penalty. Had Petitioner put the available mitigation evidence on the other side of the balance, though the Ohio courts might still have determined that death was the appropriate sentence, such evidence also "might well have influenced the [factfinder's] appraisal of [Petitioner's] moral culpability." *See Wiggins*, 539 U.S. at 538 (internal quotation marks omitted). We therefore hold that Petitioner has demonstrated prejudice.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of the writ of habeas corpus with respect to Petitioner's conviction, **REVERSE** the district court's denial of the writ of habeas corpus with respect to Petitioner's sentence, and **REMAND** with instructions that Petitioner's sentence be vacated and Petitioner be released unless he is resentenced pursuant to a new mitigation trial to be commenced within 180 days from the date of this opinion.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

SILER, Circuit Judge, concurring and dissenting. I concur in the conclusions by the majority that there were no errors in the convictions in this case. However, I respectfully dissent from the conclusion that Haliym was denied the effective assistance of counsel during the mitigation phase of sentencing. Thus, I would affirm the district court's denial of the writ in full.

I agree with the district court and with the majority that the issue of ineffective assistance of counsel in the mitigation phase has been preserved for habeas review, although the Ohio courts in post-conviction proceedings under O.R.C. § 2953.21 found that this claim was barred by *res judicata*, because it could have been raised on direct appeal. Therefore, as the district court correctly determined, because the post-conviction courts' rulings were based upon *res judicata*, we are unable to determine how those courts would have ruled on the merits. Thus, we "conduct an independent review of federal law to determine if the state court either contravened or unreasonably applied clearly established federal law." *Thompson v. Bell*, 315 F.3d 566, 586 (6th Cir. 2003) (quoting *Schoenberger v. Russell*, 290 F.3d 831, 835 (6th Cir. 2002)). As the majority states, the criteria for ineffective assistance of counsel comes from *Strickland v. Washington*, 466 U.S. 668 (1984). Under that case and its progeny, a habeas petitioner must show that counsel's performance was deficient and, second, that such performance prejudiced the defense. In order to show prejudice, an error must be such that there is "a reasonable probability that . . . the result of the proceeding would have been different." *Id*. at 694.

As the majority recounts, the mitigation evidence consisted of three witnesses and several reports plus the unsworn statement by Haliym. These witnesses covered all aspects of Haliym's life. First, his employer, Mr. Heiseler, described Haliym as a dedicated employee who was even promoted to assistant foreman and testified that no disciplinary actions had been taken against him. Haliym also called his grandmother, Martha Frazier, who related a lot of Haliym's family background, including the fact that Haliym's father died from an overdose of heroin and his mother had died from asthma. She also told of the shooting death of Haliym's brother and that Haliym was a good father and was happy with his wife. Finally, the defense called Dr. Bertschinger, a psychiatrist. He testified that Haliym had an antisocial personality disorder and was a malingerer. He also said that Haliym had made attempts on his own life. He further stated that Haliym had suffered from depression but was not then suffering from a mental disease or defect and that his intelligence was in the average range. Although the majority opinion reports that Dr. Bertschinger had spent only 1.5 hours with Haliym at the time of his diagnosis, Dr. Bertschinger did not say that he needed more time to diagnose Haliym for the case. Significantly, no one questions the qualifications of Dr. Bertschinger.

During Haliym's unsworn statement, he related his tragic upbringing and past misfortunes, including the death of his family members and that he had been incarcerated. He also expressed deep remorse and regret for his involvement in the violence and deaths that occurred in the incident involving the homicides on trial. The defense also provided reports from the juvenile court, the Cuyahoga County Jail, and the Ohio State Parole Authority.

Admittedly, Haliym presented in his post-conviction proceedings the testimony of an expert, Dr. Smalldon. Nevertheless, Dr. Smalldon is no better qualified than Dr. Bertschinger. Dr. Smalldon is a psychologist, whereas Dr. Bertschinger is a psychiatrist. Dr. Smalldon concluded that the test that he conducted "points strongly to a mild to moderate degree of functional brain impairment," but he did not say that it was to any degree of medical certainty. He concluded that Dr. Bertschinger and others earlier should have realized that Haliym *might* suffer from brain

damage. Dr. Smalldon concluded that Haliym "has a mild to moderate degree of functional brain impairment." However, he did not say that Haliym was retarded, nor did he say that Haliym was suffering from a psychosis. He also said that Haliym had depression and that he had a history of alcohol and substance abuse, plus a personality disorder with paranoid and anti-social features, which was substantially the same diagnosis made by Dr. Bertschinger.

The other evidence presented at the post-conviction proceedings was an affidavit from James Crates, a mitigation specialist. Obviously, he provided some material which had not been brought out at trial concerning Haliym's family background, including a claim by Haliym's sister, Valerie, that Haliym and his brother were beaten by their father with a baseball bat. Other family members recalled that Haliym and his mother had been beaten by his father. However, Haliym himself contradicted that in his own unsworn statement, when he said he was raised by "two of the most beautiful parents you could ever meet." Haliym even denied to Dr. Smalldon that he was ever abused. Although there might be some evidence of abuse, as the district court determined, it is uncertain whether the father "physically abused Haliym spontaneously or whether he used corporal punishment as a means of discipline."

I disagree with the majority's conclusion that this case is similar to *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003). There, trial counsel presented *no* mitigating evidence and the only mitigation raised was a plea of mercy. Here, counsel did much more. Likewise, in *Harries v. Bell*, 417 F.3d 631 (6th Cir. 2005), counsel did not seek the assistance of a mental health expert, even though counsel had been alerted by Harries's mother that Harries suffered from a mental illness. Instead, this case is closer to the factual situation in *Smith v. Mitchell*, 348 F.3d 177 (6th Cir. 2003), in which we concluded that trial counsel were not constitutionally ineffective during mitigation. Essentially, the issues brought up were similar to those in this case, claiming that the psychological evidence and the family history were not complete. As in this case, a significant amount of the alleged omitted mitigation in *Smith* was presented at trial.

Like the district court, I would find that Haliym has not shown that trial counsel during mitigation were objectively unreasonable by failing to present other psychological evidence or to obtain the testimony of other family members. In addition, I would also find, as the district court did, that Haliym cannot establish that the testimony of these additional witnesses would have impacted the outcome of the mitigation proceeding. *See Strickland*, 466 U.S. at 694. As we said in *Smith*, 348 F.3d at 206:

> [O]ur role on habeas review is not to nitpick gratuitously counsel's performance. After all, the constitutional right at issue here is ultimately the right to a fair trial, not to perfect representation. . . . Rather, we are looking to see "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."

(citations omitted). It is rare to resolve a habeas corpus case where new counsel cannot find some evidence that might have been presented in mitigation either by an expert or by a family member, but that is not the test, as we said in *Smith*.

Therefore, for the reasons stated, I would find that counsel were not ineffective during the mitigation phase of the trial, and I would affirm the decision of the district court in denying the writ of habeas corpus.