NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

NICHOLAS MAXIE,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-13728
Trial Court No. 4BE-19-00197 CR

O P I N I O N

No. 2747 — May 19, 2023

Appeal from the Superior Court, Fourth Judicial District, Bethel, William T. Montgomery, Judge.

Appearances: David T. McGee, Attorney at Law, under contract with the Public Defender Agency, and Samantha Cherot, Public Defender, Anchorage, for the Appellant. Eric A. Ringsmuth, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Wollenberg, Harbison, and Terrell, Judges.

Judge HARBISON.

Nicholas Maxie was convicted, following a jury trial, of third-degree assault, leaving the scene of an accident, and first-degree failure to stop at the direction of a police officer for repeatedly ramming a four-wheeler into an occupied taxicab on a winter evening in Bethel, and then driving away from police as they tried to apprehend

him.[1] Maxie appeals, contending that the trial court's instruction on eyewitness identification did not include all of the information that was necessary for the jury to evaluate the testimony provided by several eyewitnesses. According to Maxie, the jury instruction should have described recent scientific research explaining the limitations on the accuracy of eyewitness identifications, particularly where the fallibility of such identifications may be counterintuitive. Maxie maintains that the instructional error appreciably affected the verdicts, requiring reversal of his convictions.

For the reasons explained below, we hold that the verdict was not appreciably affected by the omission of the additional information from the court's instruction. We accordingly affirm Maxie's convictions.

*Background facts and proceedings*

At around 9:00 p.m. on a February evening in 2019, Jerilyn Ulroan was riding in a taxicab in Bethel. When the taxicab stopped to pick up another passenger, a green Honda four-wheeler with a windshield drove up to the driver's side of the cab. According to Ulroan, the driver of the four-wheeler — who was later identified as Maxie — seemed drunk and appeared to have blood on his chin. The driver repeatedly rammed his four-wheeler into the cab, causing Ulroan to think that the taxi might explode.

Two high school students, Robert Charlie and Eugene Alexie, witnessed the event. At trial, Charlie testified that he heard a bumping noise and observed a green four-wheeler with a windshield ramming a taxicab. Charlie told the jury that the driver of the four-wheeler was wearing a big coat. Alexie also described seeing a green four-wheeler, driven by a man wearing a big coat, bump a taxicab a total of six times. Alexie, Charlie, and Ulroan all testified that the four-wheeler drove off before police could contact the driver.

---

[1] AS 11.41.220(a)(1)(A), AS 28.35.050(b), and AS 28.35.182(a)(1), respectively.

Bethel Police Officer Eric Pavil responded to the scene. As Pavil arrived, a green four-wheeler with a windshield passed by, so he followed it, attempting to contact the driver. According to his testimony, Pavil activated the lights and sirens of his patrol vehicle, but the four-wheeler continued driving, traveling at a high rate of speed, going into the oncoming traffic lane, and swerving on the icy roads. Early in the pursuit, Pavil, who was familiar with Maxie from previous interactions with him, radioed that he thought the four-wheeler driver "look[ed] like Nicholas Maxie from the back." After a few minutes, Pavil lost sight of the four-wheeler. Then, a short time later, he saw it coming towards him on the road, and he gave chase once again.

Pavil later testified that, at one point, he got close enough to the driver to identify him as Maxie. Pavil estimated that he was not more than five feet away from Maxie at that time, and he stated that they were both underneath a lighted lamp post, traveling five to ten miles per hour. Pavil rolled down his window to get Maxie to stop, but Maxie kept driving.

A second police officer, William Charles, who also knew Maxie from previous interactions, participated in law enforcement efforts to apprehend the driver of the four-wheeler. Charles and Pavil followed the four-wheeler, attempting to get the driver to stop, but they lost sight of the four-wheeler multiple times. Approximately one hour into the pursuit, when the officers had lost sight of the four-wheeler, Charles noticed a green four-wheeler parked on the tundra with a person seated on it. According to Charles, he approached the four-wheeler, and when he got close (approximately three feet away), he could see that the person on it was Maxie, but Maxie then drove away. Charles later testified that he heard Pavil earlier in the pursuit radioing that he thought the driver was Maxie, but Charles asserted that his identification was independent of Pavil's suggestion.

Each time the officers resumed their pursuit of the four-wheeler, they identified the four-wheeler as the same one that rammed the cab because it matched the description in the report: a green four-wheeler with a windshield. Pavil corroborated the

description given by Alexie and Charlie, that the driver was wearing a big coat. The officers also testified they were able to identify Maxie because they were acquainted with him from previous contacts. Both officers estimated that prior to this incident, they had interacted with Maxie one to two times each month, and Pavil stated that he spoke to Maxie in the grocery store just days before the incident.

The police were unable to stop the green four-wheeler or contact the driver on the night of the incident, and they were similarly unable to locate the green four-wheeler after the incident. Maxie's face was not visibly injured when police arrested him two days later, and neither officer noticed blood on his face during the chase.

One of the other trial witnesses, Sammie Waska, testified that he knew Maxie because Maxie used to date Waska's daughter. Waska stated that he observed Maxie with a green four-wheeler with a windshield on the same evening of the taxicab-ramming incident. Maxie knocked on Waska's door and appeared to be intoxicated, which prompted Waska to call the police. Officer Charles responded to Waska's call but did not locate Maxie at Waska's residence.

Maxie's case proceeded to a jury trial. At trial, Maxie's defense was that the State could not meet its burden of proving that he was the driver of the four-wheeler.

Because identity was the only contested issue at trial, Maxie requested a jury instruction on eyewitness identification, comporting with the Alaska Supreme Court's decision in *Young v. State*,[2] and he submitted a proposed jury instruction. The State also submitted a proposed instruction. The trial court agreed to give an instruction on eyewitness identification, but after reviewing the proposals submitted by each party, the court crafted a hybrid instruction, using parts from each of the two proposals.

---

[2] *Young v. State*, 374 P.3d 395 (Alaska 2016).

Maxie was convicted of third-degree assault, leaving the scene of an accident, and first-degree failure to stop at the direction of a police officer.[3] This appeal followed.

### Young v. State and the disputed jury instruction in this case

In 2016, the Alaska Supreme Court decided *Young v. State*, which changed the law in Alaska governing eyewitness identifications.[4] Prior to *Young*, Alaska courts had followed the two-part test established by the United States Supreme Court in *Manson v. Brathwaite* to determine the admissibility of eyewitness identifications.[5]

In *Young*, the supreme court held that the *Brathwaite* test provided insufficient protection against the risks of eyewitness misidentification.[6] The supreme court explained that scientific research has identified several factors, known as "system variables" and "estimator variables," that are relevant to evaluating the risk of a misidentification.[7] System variables "are manipulable and can be influenced by the criminal justice system (such as the instructions given a witness during a lineup)."[8] Estimator variables "cannot be influenced by the criminal justice system because they are related to environmental conditions and personal characteristics (such as the stress

---

[3]   The jury also found Maxie guilty of reckless driving, AS 28.35.400, but the trial court merged this guilty verdict into the conviction for first-degree failure to stop at the direction of a police officer.

[4]   *Young*, 374 P.3d 395.

[5]   *Id.* at 405-06 (citing *Manson v. Brathwaite*, 432 U.S. 98 (1977)).

[6]   *Id.* at 412-13.

[7]   *Id.* at 417.

[8]   *Id.*

of the moment)."[9] In evaluating these variables, the *Young* court crafted a new test for determining whether eyewitness identifications should be admitted into evidence. We recently described that test in detail in *Brigman v. State*.[10]

The issue in this case does not concern whether the eyewitness identifications should have been admitted into evidence. Rather, it concerns the instruction the court provided to the jury about how to evaluate the reliability and accuracy of the eyewitness identifications that were already admitted into evidence.

This issue was also addressed in *Young*. The court recognized that even when a judge decides to admit an eyewitness identification, the judge should "provide the jury with an instruction appropriate to the context of the case."[11] The court accordingly held that if eyewitness identification is a significant issue in a case, "the trial court should issue an appropriate jury instruction that sets out the relevant factors affecting reliability."[12] The court asked the Alaska Criminal Pattern Jury Instructions Committee to draft a model instruction appropriate for use in future cases that was "consistent with the principles" announced in *Young*.[13]

In making this request, the court emphasized that the reliability of eyewitness identifications is outside the jury's common knowledge and often contradicts commonsense understandings:

> While it is the province of the jury to determine credibility of witnesses, the reliability of eyewitness identifications frequently is not a matter within the knowledge of an average juror. Many of the factors that affect reliability are

---

[9]  *Id.*

[10]  *Brigman v. State*, 513 P.3d 1072 (Alaska App. 2022).

[11]  *Young*, 374 P.3d at 427.

[12]  *Id*. at 428.

[13]  *Id.*

counterintuitive and, therefore, not coterminous with common sense. Thus, while science has firmly established the inherent unreliability of human perception and memory, this reality is outside the jury's common knowledge, and often contradicts jurors commonsense understandings.[14]

Maxie's trial was held in June 2019. At that time, the criminal pattern jury instructions committee had not yet issued a model instruction. Maxie therefore drafted his own instruction based on *Young* and proposed it to the court.

Maxie's instruction emphasized that eyewitness identifications are often unreliable and explained that scientific research has revealed several defects in human memory. For example, Maxie's proposed instruction stated that "[e]yewitness identification evidence must be scrutinized carefully," that "[h]uman memory is not foolproof," and that "[eyewitness] identifications, even if made in good faith, may be mistaken."

Maxie's proposed instruction also described a series of factors that, according to scientific research, can affect eyewitness identifications. For example, the proposed instruction stated that "a brief or fleeting contact is less likely to produce an accurate identification," that the "greater the distance between an eyewitness and a perpetrator, the higher the risk of a mistaken identification," and that "high levels of stress can reduce an eyewitness's ability to recall and make an accurate identification."

The State proposed its own much shorter instruction on eyewitness identification. Like Maxie's proposed instruction, the State's instruction emphasized that "evidence of an eyewitness's identification should be evaluated with care," and it listed a series of factors for jurors to consider in evaluating whether the witness made an accurate and reliable identification.

But unlike Maxie's proposed instruction, the State's instruction did not reference scientific research on eyewitness identifications, and it did not explain that

---

14   *Id.* (citations and internal quotation marks omitted).

eyewitness identifications are often unreliable. It also did not explain *how* the listed factors affected the accuracy and reliability of identifications. It stated, for example, that one factor to be considered was "How long was the witness able to see the perpetrator?" but it did not explain that a brief or fleeting contact is less likely to produce an accurate identification.

The trial court expressed discomfort with Maxie's proposed instruction because it described the results of scientific research, which the court viewed as equivalent to presenting scientific evidence rather than explaining the law. The court acknowledged that the supreme court had addressed and endorsed much of that scientific evidence in *Young*, but the court explained that "none of that [scientific evidence] has been presented in this specific case." The court ruled that given the lack of scientific evidence presented in Maxie's case, it did not "feel like [it had] the ability to go that far" — *i.e.*, to instruct the jury about the results of scientific research.

The court accordingly declined to give the more expansive instruction requested by Maxie. The court instead crafted its own instruction, which it described as a "hybrid" of Maxie's proposed instruction and the State's. The hybrid instruction was somewhat more detailed than the State's, but it did not include any reference to scientific research, did not suggest that eyewitness identifications are often mistaken, and did not explain how the listed factors affected the accuracy of eyewitness identifications.

In early 2020, after Maxie's trial, the Alaska Criminal Pattern Jury Instructions Committee approved a pattern jury instruction for use in cases involving eyewitness identification. Much like Maxie's proposed instruction, and unlike the instruction given by the trial court in this case, the pattern instruction cautioned jurors that eyewitness identifications can be unreliable, explained that this view was supported

by scientific research, and described in detail how different factors affected the reliability and accuracy of eyewitness identifications.[15]

In a use note attached to the pattern instruction, the committee explained that the "instruction is unique among jury instructions, and the committee struggled with the *Young* court's direction to characterize the state of scientific knowledge that usually comes to juries in the form of expert testimony."[16] The committee explained that "[t]he state of scientific knowledge evolves over time, and eyewitness instructions will need to be revised to remain consistent with scientific knowledge."[17]

*Why we affirm Maxie's convictions*

On appeal, Maxie argues that the trial court erred when it refused to give his proposed instruction. Maxie argues that his instruction closely resembles the pattern instruction, and that the pattern instruction more accurately reflects the supreme court's intent in *Young*.

When the trial court declined to give Maxie's proposed instruction, the court explained that it would not give an instruction to the jury on scientific research that had not been presented in the context of Maxie's specific case, particularly when the criminal pattern jury instructions committee had not yet promulgated an appropriate instruction. We understand the court's reluctance to instruct the jury about scientific principles where, as here, the defendant did not present expert testimony, scholarly articles, or treatises to support the proposed instruction. But the *Young* court directed trial courts, in cases where eyewitness identification is a significant issue, to "issue an appropriate jury instruction that sets out the relevant factors affecting [eyewitness]

---

[15]   Alaska Criminal Pattern Jury Instruction 1.24 (2020).

[16]   Use Note for Alaska Criminal Pattern Jury Instruction 1.24 (2020).

[17]   *Id.*

reliability."[18] In issuing this directive, the *Young* court further explained that "while science has firmly established the inherent unreliability of human perception and memory, this reality is outside the jury's common knowledge, and often contradicts jurors commonsense understandings."[19]

We accordingly conclude that the supreme court intended that trial courts would issue instructions informing the jurors that scientific research has suggested that eyewitness identifications can be unreliable. Indeed, because the unreliability of eyewitness identifications is "not a matter within the knowledge of an average juror" and often contradicts common sense, a prohibition on references to scientific research would make it extremely difficult to comply fully with the spirit of *Young* in cases where that scientific research is relevant.

The criminal pattern jury instructions committee evidently also interpreted *Young* in this way. The pattern instruction refers to scientific research, although the use note acknowledges that "the committee struggled with the *Young* court's direction to characterize the state of scientific knowledge that usually comes to juries in the form of expert testimony."[20]

Our interpretation of *Young* is further supported by the *Young* court's reliance on the New Jersey Supreme Court's opinion in *State v. Henderson*.[21] As our supreme court noted, its own analysis in *Young* "closely follows the framework set out by the Supreme Court of New Jersey in *State v. Henderson*."[22] After *Henderson* (and four years before *Young* was decided), the New Jersey Supreme Court issued a pattern

---

[18]   *Young*, 374 P.3d at 428.

[19]   *Id.* (citations and internal quotation marks omitted).

[20]   Use Note for Alaska Criminal Pattern Jury Instruction 1.24 (2020).

[21]   *State v. Henderson*, 27 A.3d 872 (N.J. 2011).

[22]   *Young*, 374 P.3d at 427.

instruction designed to comport with *Henderson*. Much like Alaska's pattern instruction, the New Jersey model instruction informs jurors that research has revealed that eyewitness identifications can be mistaken and instructs the jury about what factors to consider in evaluating the reliability and accuracy of eyewitness identifications.[23]

For all these reasons, we conclude the trial court erred when it denied Maxie's proposed instruction on the grounds that it lacked the authority to instruct the jury on matters of scientific research that had not been introduced into evidence in Maxie's case.

We ultimately conclude, however, that the court's legal error was not prejudicial. Weighing most heavily in the balance is that this case does not involve a stranger identification. As several courts have recognized, "identification of a person who is well-known to the eyewitness generally does not give rise to the same risk of misidentification as does the identification of a person who is not well-known to the eye-witness."[24] Here, the officers who identified Maxie were not strangers to him, and thus the risk of misidentification was significantly lower.

---

[23] New Jersey Model Jury Charges (Criminal), Identification (2012).

[24] *State v. Guilbert*, 49 A.3d 705, 736 (Conn. 2012); *see Haliym v. Mitchell*, 492 F.3d 680, 706 (6th Cir. 2007) ("The primary concern expressed in cases discussing the problems with eyewitness identification relates to a witness observing and subsequently identifying a stranger. Witnesses are very likely to recognize under any circumstance the people in their lives with whom they are most familiar, and any prior acquaintance with another person substantially increases the likelihood of an accurate identification." (citation and internal quotation marks omitted)); *Rosario v. Ercole*, 582 F. Supp. 2d 541, 581 (S.D.N.Y. 2008) ("Eyewitness identification by a stranger is even more susceptible to error than identification by someone who is otherwise familiar with an alleged perpetrator."); *Bonnell v. Mitchel,* 301 F. Supp. 2d 698, 761 (N.D. Ohio 2004) ("The danger in eyewitness testimony is most pronounced when strangers observe the unexpected commission of a crime and sometime later try to describe people and events involved in the crime. In this case, while not initially admitting it, both [eyewitnesses] were acquainted with [the defendant] and recognized him as the murderer. Their testimony was therefore not subject to the unreliability often present when strangers attempt to describe and identify persons . . . involved in a crime." (citation omitted)).

Additionally, although the instruction given by the court did not reference scientific research, the instruction still told the jury that eyewitness identifications should not be taken at face value and should be examined critically. In particular, the instruction warned the jury that "[e]yewitness identification should be examined with care," and cautioned jurors to "consider the observations and perceptions on which the identification was based, the witness's ability to make those observations and perceive events, and the circumstances under which the identification was made."

Furthermore, the court's instruction listed all but one of the estimator variables set out by the supreme court's decision in *Young*.[25] Although the court's instruction did not discuss these variables as thoroughly as the current pattern jury instruction, many of these variables did not apply to the facts of this case (e.g., the presence of a weapon; whether the suspect is wearing a disguise; or the time between the witness's observation and their identification of the suspect). Thus, further discussion of these variables was not particularly relevant or material in the context of this case.

Ultimately, the factors that were most relevant to this case — the duration of the observation and the environmental conditions attendant to it — were those commonly understood by jurors and accordingly required little additional explanation. Jurors would understand, based on their own experiences and common sense, that if the suspect was viewed in poor lighting conditions, from far away, for only a brief duration, or when the person's face was obstructed, the identification would be less reliable. Furthermore, the defense attorney relied on these factors in his closing argument, when he pointed out that the officers claimed to have identified Maxie as the driver of the

---

[25] "Memory decay/retention interval" was the only estimator variable not mentioned. But the concept that the accuracy of memory fades over time is consistent with jurors' everyday knowledge and common sense.

four-wheeler even though the driver had covered his face when Pavil drove by him, and even though the officers' observations were made after dark, in poor lighting, and only for a short duration of time.

We therefore conclude that, even if the trial court had given Maxie's proposed instruction, the additional information in Maxie's instruction would not have appreciably affected the verdict under the facts of this case.[26]

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

[26] *Young*, 374 P.3d at 429-30 & n.232.